INTERCONTINENTAL PARTS, INC., Plaintiff-Appellant, v. CATERPIL-
LAR, INC., *et al.*, Defendants-Appellees.

First District (6th Division)    No. 1—92—0420

Opinion filed March 18, 1994.

Benos & Oleksiuk, of Palatine (B. George Oleksiuk, of counsel), for appellant.

Mayer, Brown & Platt, of Chicago (Thomas B. McNeill and T. Mark McLaughlin, of counsel), Curtis W. Enyeart, of Caterpillar, Inc., of Peoria, and Howrey & Simon, of Washington, D.C. (Richard T. Colman and Gregory L. Baker, of counsel), for appellees.

JUSTICE GIANNIS delivered the opinion of the court:

Plaintiff instituted this action against defendants, Caterpillar, Inc. (Caterpillar), and Patten Industries, Inc. (Patten), alleging violations of the Illinois Antitrust Act (Ill. Rev. Stat. 1989, ch. 38, par. 60—1 *et seq.* (now codified at 740 ILCS 10/1 *et seq.* (West 1992))) and claiming tortious interference with contractual relations or with prospective economic advantage. Plaintiff sought injunctive relief in addition to compensatory and punitive damages. During the pendency of the litigation, defendant Patten was dismissed from the case pursuant to a stipulation between plaintiff and Patten. The trial court granted summary judgment in favor of defendant Caterpillar, finding that plaintiff had failed to raise a genuine issue of material fact as to each element of the claims asserted. Plaintiff challenges the court's grant of summary judgment and raises the following 12 issues for review: (1) whether the trial court erred in granting defendant summary judgment based upon defendant's affidavits in support of the motion and based upon the limited discovery conducted by the plaintiff; (2) whether the dual distribution arrangement by Caterpillar should be treated as a *per se* antitrust violation; (3) whether the restraints imposed by Caterpillar's policy were horizontal and should have been treated as *per se* violations; (4) whether the plaintiff raised a genuine issue of material fact as to a conspiracy between Caterpillar and its dealers; (5) whether plaintiff presented sufficient evidence to prove an antitrust violation under the rule of reason; (6) whether

plaintiff presented sufficient evidence as to a relevant market; (7) whether plaintiff presented sufficient evidence as to Caterpillar's market power within the relevant market; (8) whether the export policy had anticompetitive or exclusionary effects; (9) whether the export policy was reasonably necessary to achieve a legitimate procompetitive purpose; (10) whether plaintiff presented sufficient evidence of an antitrust injury; (11) whether plaintiff presented sufficient evidence to establish its monopolization claims; and (12) whether the trial court erred in granting summary judgment on plaintiff's claims of tortious interference with contractual relations or with prospective economic advantage.

The record reveals that Caterpillar designs, manufactures, and distributes large, sophisticated construction and earth-moving equipment. Caterpillar also sells replacement parts for use in maintenance and repair of its large equipment. Some of these parts are manufactured by Caterpillar, and others are manufactured by outside firms to Caterpillar's specifications. Many of these parts are protected by patents, and most others are unique, having no interchangeable substitute. Caterpillar distributes its replacement parts to overseas consumers through its domestic authorized dealers and through Caterpillar Export Services (CES), a branch of Caterpillar which was created in 1990 as a component of the implementation of Caterpillar's 1982 export parts policy. Caterpillar's authorized overseas dealers provide service as well as sales of parts and compete directly with the customers of the plaintiff for service of Caterpillar equipment requiring replacement parts.

Plaintiff, an Illinois corporation, is in the business of exporting replacement parts for use in heavy equipment, including Caterpillar equipment. Plaintiff buys parts from domestic sources and sells them to overseas firms which service and repair heavy equipment made by Caterpillar and other equipment manufacturers. Plaintiff also exports parts to consumers who service their own equipment. Plaintiff does not provide service of any equipment, but functions only as an independent exporter of parts to independent dealers and to consumers who do their own service. Plaintiff has previously sold parts at prices which were lower than those charged by authorized overseas dealers and has been able to deliver parts more quickly than authorized overseas dealers. Plaintiff and other independent resellers were engaged in parts export prior to 1982.

In 1982, Caterpillar instituted an export policy which prohibited sales of parts by authorized domestic dealers to other resellers for export from the United States. This policy did not in any way limit the sale of replacement parts to consumers by Caterpillar's autho-

rized dealers. Those dealers were free to sell replacement parts for use outside their service territories, including overseas. The export policy was communicated to Caterpillar dealers in a letter which also stated that the failure to comply with the policy would be regarded as a deliberate violation of the dealership agreement with Caterpillar and could lead to termination.

In 1990, Caterpillar reaffirmed the 1982 policy and instituted detailed implementation guidelines, including (1) the publication and circulation of a list of independent parts exporters as a means of identifying unauthorized resellers overseas, (2) elimination of 60% of the dealer discount to domestic dealers on sales of parts intended for export, (3) formation of CES to solicit and sell directly to large overseas accounts and to process all export parts orders, (4) guidelines governing limited sales of parts for export to exclusive purchasing agents (independent resellers who were permitted to resell directly to consumers whose identities were disclosed to Caterpillar), and (5) requiring that dealers provide CES with detailed information on all orders and on the firms placing the orders.

Plaintiff, who had purchased parts from Patten prior to 1990, was included on the list of resellers. In September 1990, a Caterpillar representative discovered that plaintiff was purchasing parts from Patten. On September 7, 1990, Patten informed plaintiff that it had been ordered to discontinue its sales of Caterpillar replacement parts to plaintiff. During September 1990, representatives of plaintiff, Patten, and Caterpillar met to discuss the import of the 1990 export parts policy. Caterpillar persisted in the enforcement of the export parts policy, and since that time, plaintiff has been unable to purchase Caterpillar parts from Patten or other authorized dealers and has relied upon indirect sources for Caterpillar parts. As a result, plaintiff has paid a higher price than that previously paid to Patten and has experienced delays in obtaining parts.

Plaintiff filed suit, claiming that the 1990 parts policy constituted antitrust violations and amounted to tortious interference with plaintiff's business relations. Plaintiff sought injunctive relief as well as compensatory and punitive damages. Defendants Caterpillar and Patten filed a joint motion to dismiss or, in the alternative, for summary judgment. The trial court denied the request for dismissal but granted summary judgment in favor of defendants. Patten was subsequently dismissed from the case pursuant to a stipulation with plaintiff.

Plaintiff filed a motion for reconsideration which was denied by the trial court, and plaintiff has appealed.

We initially consider plaintiff's assertion that the trial court

erred in granting defendant summary judgment based upon defendant's affidavits in support of the motion and based upon the limited discovery conducted by the plaintiff.

Plaintiff claims that the trial court should not have granted summary judgment because the affidavits submitted by Caterpillar contained conclusory, hearsay, and undocumented declarations by Caterpillar employees without a showing of personal knowledge. Specifically, plaintiff challenged paragraphs 2, 3, 6, 7, 9, 10, 11, 12, and 13 of the affidavit of Pat R. Dalton; paragraphs 3 and 4 of the affidavit of William F. Springer; and the entire affidavit of James F. Jolly. Plaintiff moved to strike these portions of the affidavits, contending that they did not comply with the requirements set forth in Supreme Court Rule 191(a) (134 Ill. 2d R. 191(a)). Although the arguments for striking the challenged portions of the affidavits were presented at the hearing held June 12, 1991, plaintiff did not obtain a ruling on this motion.

■ The failure to enter a ruling on a motion is not equivalent to a denial of the motion (*Veterans Travel Club v. Illinois Commerce Comm'n* (1973), 15 Ill. App. 3d 116, 119, 303 N.E.2d 142), and a party who has filed a motion seeking certain relief from the court is obligated to obtain a ruling on that motion (*Fulford v. O'Connor* (1954), 3 Ill. 2d 490, 501-02, 121 N.E.2d 767). When a party moves to strike an affidavit which has been filed in support of a motion for summary judgment, it is that party's duty to bring his motion to the attention of the trial court and to get a ruling on the motion, and the failure to obtain such a ruling will operate as a waiver of the objections to the affidavit. *King v. Linemaster Switch Corp.* (1992), 238 Ill. App. 3d 729, 731, 606 N.E.2d 584; *McBride v. Commercial Bank* (1981), 101 Ill. App. 3d 760, 763, 428 N.E.2d 739.

In the instant case, plaintiff failed to obtain a ruling on its motion to strike. Consequently, plaintiff has waived the right to argue on appeal that the trial court should not have considered the affidavits submitted by Caterpillar.

■ Plaintiff also asserts that the court should not have granted summary judgment because plaintiff had conducted only limited discovery and because Caterpillar possessed much of the relevant information necessary to support plaintiff's claims. The record reveals, however, that plaintiff did not file a motion to compel compliance with its request for production of documents, and plaintiff failed to file an affidavit pursuant to Rule 191(b).

In opposing the motion for summary judgment, plaintiff asserted that it lacked information possessed by Caterpillar as to market share statistics. Yet, plaintiff never requested additional discovery

under Supreme Court Rule 191(b) (134 Ill. 2d R. 191(b)). Plaintiff did not file an affidavit containing a statement that material facts were known only to persons whose affidavits the plaintiff was unable to procure by reason of hostility or otherwise, identifying the persons, and showing why their affidavits could not be procured and what the plaintiff believed they would testify to if sworn, along with the reasons for this belief. Consequently, plaintiff cannot claim that the entry of summary judgment must be reversed because plaintiff required additional discovery in order to oppose the motion for summary judgment. See *Fooden v. Board of Governors of State Colleges & Universities* (1971), 48 Ill. 2d 580, 588, 272 N.E.2d 497; *Schultz v. Hennessy Industries, Inc.* (1991), 222 Ill. App. 3d 532, 543, 584 N.E.2d 235; *Fearon v. Mobil Joliet Refining Corp.* (1984), 131 Ill. App. 3d 1, 9, 475 N.E.2d 549.

We next review the trial court's grant of summary judgment in favor of Caterpillar on each of the antitrust claims asserted by plaintiff. In reviewing the rulings by the trial court, we are guided by precedent interpreting Federal antitrust laws that contain language which is the same or similar to that used in the Illinois Antitrust Act. Ill. Rev. Stat. 1989, ch. 38, par. 60—11 (now 740 ILCS 10/11 (West 1992)); *Laughlin v. Evanston Hospital* (1990), 133 Ill. 2d 374, 386, 550 N.E.2d 986; *People ex rel. Scott v. College Hills Corp.* (1982), 91 Ill. 2d 138, 150, 435 N.E.2d 463.

Plaintiff first contends that the trial court erred in failing to treat the dual distribution system by Caterpillar as a *per se* violation of the Illinois statute.

■ Section 3(1) of the Illinois Antitrust Act characterizes three types of conduct as *per se* violations: horizontal agreements to fix prices, limit production, or allocate markets or customers. Ill. Rev. Stat. 1989, ch. 38, par. 60—3(1); *Blake v. H-F Group Multiple Listing Service* (1976), 36 Ill. App. 3d 730, 740-41, 345 N.E.2d 18.

■ Horizontal restraints of trade are defined as those "involving businesses at the same level of operation *** agreement[s] between competitors to refuse to deal with one or more persons." (Black's Law Dictionary 737 (6th ed. 1990).) Vertical restraints of trade consist of "[a]nticompetitive agreements between entities operating at different levels of market structure, such as manufacturers and distributors." Black's Law Dictionary 1562 (6th ed. 1990).

■ Dual distribution arrangements exist where manufacturers sell directly to consumers as well as marketing their products through distributors in exclusive territories. (See *Midwestern Waffles, Inc. v. Waffle House, Inc.* (11th Cir. 1984), 734 F.2d 705, 720.) Although dual distribution arrangements have sometimes erroneously

been characterized as horizontal and subjected to a *per se* analysis, the mere fact that a supplier engages in distribution does not transform a vertical restriction into a horizontal restraint on trade. *International Logistics Group, Ltd. v. Chrysler Corp.* (6th Cir. 1989), 884 F.2d 904, 906; *Tidmore Oil Co. v. BP Oil Co./ Gulf Products Division* (11th Cir. 1991), 932 F.2d 1384, 1390 n.4; *Midwestern Waffles, Inc. v. Waffle House, Inc.* (11th Cir. 1984), 734 F.2d 705, 720-21.

The 1990 export parts policy was a vertical nonprice restraint imposed by Caterpillar upon its distributors and was directed to competitors at different levels of competition. Thus, although some minimal horizontal competitive effects may have resulted, the export parts policy was not directed toward or designed to impose restraints upon parties at the same competitive level even where Caterpillar was also a distributor. *Business Electronics Corp. v. Sharp Electronics Corp.* (1988), 485 U.S. 717, 99 L. Ed. 2d 808, 108 S. Ct. 1515; *International Logistics Group*, 884 F.2d at 906.

■ The effects of vertical restraints, such as territorial and customer allocations imposed by a supplier on its retailer, are not manifestly anticompetitive and promote interbrand competition. (*Continental T.V., Inc. v. GTE Sylvania Inc.* (1977), 433 U.S. 36, 54-56, 53 L. Ed. 2d 568, 583-84, 97 S. Ct. 2549, 2559-61.) Dual distribution systems are analyzed in the same manner as other vertical nonprice restraints (*International Logistics Group, Ltd.*, 884 F.2d at 906; Vertical Restraint Guidelines, § 2.2, 50 Fed. Reg. 6263, 6265 (1985)) and do not require application of a *per se* ban where the practice would be lawful if the manufacturer did not sell directly to customers. (*Illinois Corporate Travel, Inc. v. American Airlines, Inc.* (7th Cir. 1989), 889 F.2d 751, 753.) Accordingly, we hold that Caterpillar's dual distribution system constituted a vertical nonprice restraint which was to be reviewed under the rule of reason.

In reaching this conclusion, we reject plaintiff's argument that Caterpillar's dual distribution arrangement constitutes a horizontal restraint on trade and must be considered a *per se* violation of the Illinois Antitrust Act. In support of this argument, plaintiff relies upon the decision in *People v. Keystone Automotive Plating Corp.* (1981), 98 Ill. App. 3d 40, 423 N.E.2d 1246. We find, however, that this case is factually distinguishable from the case at bar and, therefore, is not controlling here.

In *Keystone Automotive Plating Corp.*, the defendants challenged the sufficiency of a criminal indictment charging a violation of section 3(1)(a) for horizontal price fixing. The defendants asserted that the indictment was defective because it presented a charge of vertical

price fixing by alleging that defendants engaged in a conspiracy to fix the prices of reconditioned automotive bumpers sold at wholesale and retail. All of the named defendants were in the business of manufacturing reconditioned automotive bumpers, and the indictment stated that the defendants sold primarily to retailers or distributors. The court held that the indictment brought against the defendants properly charged them with horizontal price fixing. In so doing, the court noted that the indictment set forth the language of section 3(1)(a) and clearly specified that the parties charged in the conspiracy were competitors or would have been competitors, but for the conspiracy. The indictment did not charge a conspiracy to fix prices with retailers which would constitute vertical price fixing. The court held that, even where some of the defendants might have made direct sales to consumers, the conspiracy charged in the criminal indictment was a horizontal price-fixing scheme between manufacturers of reconditioned automotive bumpers who were operating at the same level in the chain of distribution.

Contrary to plaintiff's claim, the decision in *Keystone Automotive Plating Corp.* does not require that all dual distribution arrangements be considered horizontal restraints and treated as *per se* violations of the Illinois Antitrust Act. The opinion in *Keystone Automotive Plating Corp.* addressed only the sufficiency of the criminal indictment charging a horizontal price-fixing conspiracy. This case did not define dual distribution arrangements, nor did it characterize them as horizontal or vertical trade restraints. In addition, this case did not discuss whether a dual distribution system should be analyzed as a *per se* violation or under the rule of reason when asserted in a civil antitrust case. We do not believe that this opinion supports plaintiff's assertion that, in Illinois, dual distribution arrangements constitute horizontal restraints and must be analyzed as if a *per se* violation had been alleged.

In the instant case, the 1990 export parts policy imposed by Caterpillar upon its distributors and dealers restricted sales of replacement parts to only those customers who were not resellers in overseas markets. This restriction constituted a vertical nonprice restraint imposed by the manufacturer/supplier upon a dealer/retailer, who operated at a different level in the chain of distribution. Plaintiff has not alleged any facts which would support a horizontal restraint of trade claim. Consequently, we hold that the trial court properly employed the rule of reason in analyzing plaintiff's antitrust claims predicated upon the 1990 export parts policy.

■ Plaintiff also contends that the restraints imposed by Caterpillar's policy should have been treated as *per se* violations

because they constituted a tying agreement and/or a group boycott. In making this argument, plaintiff relies upon the decision in *Eastman Kodak Co. v. Image Technical Services, Inc.* (1992), 504 U.S. 451, 119 L. Ed. 2d 265, 112 S. Ct. 2072, which held that a restrictive parts policy constituted a tying agreement which was to be treated as a *per se* violation of Federal antitrust laws. This decision was premised upon the finding that Kodak had unlawfully tied the sale of its replacement parts to the sale of service by Kodak technicians. A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product. *Northern Pacific Ry. Co. v. United States* (1958), 356 U.S. 1, 5-6, 2 L. Ed. 2d 545, 549-50, 78 S. Ct. 514, 518; *Trans Sport, Inc. v. Starter Sportswear, Inc.* (2d Cir. 1992), 964 F.2d 186, 192.

Because the case at bar does not involve a tying arrangement for two different products and because plaintiff has not alleged such a violation, the reasoning employed in *Eastman Kodak Co.* is not controlling here. Rather, the trial court's decision in this case must be reviewed under the rule of reason and in accordance with the precepts set forth in the vertical restraint cases. See *Continental T.V., Inc.*, 433 U.S. at 54-56, 53 L. Ed. 2d at 583-84, 97 S. Ct. at 2559-61; *Blake*, 36 Ill. App. 3d at 741-43.

In addition, a group boycott claim must also be analyzed under the rule of reason as required by section 2 of the Illinois Antitrust Act. Ill. Ann. Stat., ch. 38, par. 60—3(2), Historical & Practice Notes—1970, at 460-61 (Smith-Hurd 1977); *Laughlin v. Evanston Hospital* (1990), 133 Ill. 2d 374, 399-400, 550 N.E.2d 986 (Clark, J., concurring).

■ We next consider plaintiff's assertion that the trial court erred in finding that there was insufficient evidence to raise a genuine issue of material fact as to a conspiracy between Caterpillar and its dealers.

Section 3(2) of the Illinois Antitrust Act prohibits any contract, combination, or conspiracy which unreasonably restrains trade or commerce. Ill. Rev. Stat. 1989, ch. 38, par. 60—3(2).

Plaintiff asserts that Caterpillar's replacement parts policy constituted a conspiracy between Caterpillar and its dealers to limit supply and to increase prices for those parts. The trial court found, however, that Caterpillar's export parts policy was wholly unilateral and a reaffirmation of a previously existing rule. The court found further that the dealers' acquiescence in the policy was insufficient to establish a conspiracy.

Plaintiff contends that a conspiracy between Caterpillar and its dealers was established where they shared a conscious commitment to a common scheme designed to achieve an unlawful end. (See *Mon-*

*santo Co. v. Spray-Rite Service Corp.* (1984), 465 U.S. 752, 764, 79 L. Ed. 2d 775, 786, 104 S. Ct. 1464, 1471.) Plaintiff argues that Caterpillar elicited the dealers' willingness to deny Caterpillar products to independent resellers. In support of this argument, plaintiff asserts that the dealers communicated their acquiescence or agreement through the detailed guidelines of the 1990 policy and the list of resellers. Plaintiff claims that the 1990 policy and corresponding list of resellers involved active dealer agreement and participation.

It is established that a manufacturer generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently. (*United States v. Colgate & Co.* (1919), 250 U.S. 300, 307, 63 L. Ed. 992, 997, 39 S. Ct. 465, 468.) Unilateral conduct alone is not sufficient to establish a conspiracy, and the plaintiff cannot overcome this burden merely by alleging that the manufacturer announced the restrictive policy to its dealers and then implemented enforcement of that policy. (*Monsanto Co.*, 465 U.S. at 761-63, 79 L. Ed. 2d at 783-85, 104 S. Ct. at 1469-70; *Colgate & Co.*, 250 U.S. at 307, 63 L. Ed. at 997, 39 S. Ct. at 468.) To satisfy its burden of proof, plaintiff was required to present evidence establishing that Caterpillar did not act independently in formulating and implementing its replacement parts policy. *Monsanto Co.*, 465 U.S. at 764, 79 L. Ed. 2d at 785-86, 104 S. Ct. at 1470-71; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.* (1986), 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348.

A conspiracy will not be found where a dealer or distributor involuntarily complies with a manufacturer's restrictive parts policy in order to avoid termination of its product source. (*International Logistics Group, Ltd. v. Chrysler Corp.* (6th Cir. 1989), 884 F.2d 904, 907; *Beach v. Viking Sewing Machine Co.* (6th Cir. 1986), 784 F.2d 746, 750.) There can be no conspiracy where the party imposing the alleged restraint does not need the agreement of the other party. (*International Logistics Group, Ltd.*, 884 F.2d at 907.) It is inappropriate to consider intraband restraints as "agreements to conspire," and manufacturers are permitted to independently impose appropriate vertical restraints where the manufacturers merely exercise the unilateral power over their own products. (*International Logistics Group, Ltd.*, 884 F.2d at 907.) In these situations, no antitrust conspiracy will be found even if the manufacturer has forced others to abide by the restraints. *International Logistics Group, Ltd.*, 884 F.2d at 907.

In the case at bar, plaintiff alleged that Caterpillar instituted the 1990 policy along with the list of resellers. The only specific allegations of an agreement by a dealer are those which describe a meeting between employees of Caterpillar, Patten, and plaintiff in

September 1990. These allegations alone are not sufficient to establish a conspiracy because a distributor may acquiesce in a manufacturer's demand in order to avoid termination. (*Monsanto Co.*, 465 U.S. at 761, 79 L. Ed. 2d at 784, 104 S. Ct. at 1469.) The record in the case at bar supports the conclusion that the replacement parts policy instituted by Caterpillar in 1990 was unilaterally formulated and uniformly implemented as to all distributors of Caterpillar replacement parts. Accordingly, we affirm the trial court's determination that plaintiff failed to present sufficient facts to establish a conspiracy between Caterpillar and its dealers and distributors.

■ Plaintiff also challenges the trial court's finding that plaintiff failed to present sufficient evidence to support a monopolization claim against Caterpillar.

Section 3(3) of the Illinois Antitrust Act makes it illegal for any party to establish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce. Ill. Rev. Stat. 1989, ch. 38, par. 60—3(3).

In order to sustain a monopolization claim, the plaintiff must prove not only that the defendant had the power to monopolize, but also that it willfully acquired or maintained its power, causing unreasonable exclusionary or anticompetitive effects. (*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.* (1985), 472 U.S. 585, 602, 86 L. Ed. 2d 467, 480, 105 S. Ct. 2847, 2857; *Trans Sport, Inc.*, 964 F.2d at 188.) Proof of willful intent and unreasonable exclusionary or anticompetitive effects is required to establish that the defendant's conduct was predatory, rather than merely efficient business practices. *Aspen Skiing Co.*, 472 U.S. at 605, 86 L. Ed. 2d at 482-83, 105 S. Ct. at 2858-59; *Trans Sport, Inc.*, 964 F.2d at 188-89.

Although vertical restraints, such as the 1990 parts policy at issue here, invariably reduce intrabrand competition and may result in a higher aggregate price for the product, this is insufficient to prove a monopolization claim. (*Trans Sport, Inc.*, 964 F.2d at 189.) Absent proof of any purpose to create or maintain a monopoly, a manufacturer engaged in an entirely private business is free to choose the parties with whom it will deal. (*Aspen Skiing Co.*, 472 U.S. at 602, 86 L. Ed. 2d at 480, 105 S. Ct. at 2857; *Trans Sport, Inc.*, 964 F.2d at 189.) Proof of a monopoly claim requires that the plaintiff establish conduct designed to maintain or enhance monopoly power improperly. (*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.* (7th Cir. 1986), 797 F.2d 370, 373.) Where a monopolization claim has been alleged, courts will consider whether the defen-

dant engaged in the challenged conduct for a legitimate business reason or solely to insulate the firm from competitive pressure. *Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.* (7th Cir. 1991), 935 F.2d 1469, 1481.

We believe the trial court correctly determined that plaintiff had not presented sufficient evidence that Caterpillar's 1990 parts policy was purposefully designed to create or maintain a monopoly.

The affidavits filed by Caterpillar in support of its motion for summary judgment averred that the 1990 parts policy was employed by Caterpillar to improve the service provided its overseas customers, to support its overseas dealers, to maintain quality, and to control free riders (providers of goods or services who reap the benefits of capital invested by its competitors but do not invest capital themselves) (see *Beach*, 784 F.2d at 751 n.6). These valid business justifications are sufficient to establish a *prima facie* case of lawful conduct (*Trans Sport, Inc.*, 964 F.2d at 190-91), and the plaintiff was obligated to allege facts that support an inference that the proffered justifications were merely pretextual (*Trans Sport, Inc.*, 964 F.2d at 191). Because plaintiff has not alleged facts from which a trier of fact could infer that Caterpillar's 1990 parts policy was purposefully designed to fix prices or to exclude competition, we hold that the trial court did not err in finding that Caterpillar's policy was reasonably necessary to achieve these legitimate goals. See *Bruce Drug, Inc. v. Hollister Inc.* (1st Cir. 1982), 688 F.2d 853, 860.

Moreover, a manufacturer cannot be charged with antitrust violations if it monopolizes its own brand. (*International Logistics Group, Ltd.*, 884 F.2d at 908.) A manufacturer is entitled to the benefits of maintaining a "monopoly" over products which it has developed and produced because the incentives for innovation and development of beneficial products would be stifled if manufacturers were denied a monopoly over their own unique products. (*International Logistics Group, Ltd.*, 884 F.2d at 908.) Monopolization of a single brand is not an antitrust violation. (*International Logistics Group, Ltd.*, 884 F.2d at 908.) Accordingly, Caterpillar's implementation of the 1990 export parts policy was insufficient to support a monopolization claim.

We also hold that the trial court properly found that plaintiff had not presented sufficient evidence to establish that Caterpillar's 1990 parts policy had anticompetitive or exclusionary effects.

The market impact of vertical restrictions is complex because of their potential for a simultaneous reduction in intrabrand competition and stimulation of interbrand competition. (*Continental T.V., Inc.*, 433 U.S. at 51, 53 L. Ed. 2d at 581, 97 S. Ct. at 2558.) Vertical restrictions reduce intrabrand competition by limiting the number of

sellers of a particular product competing for the business of a given group of buyers. (*Continental T.V., Inc.*, 433 U.S. at 54, 53 L. Ed. 2d at 582-83, 97 S. Ct. at 2559.) Although intrabrand competition may be reduced, the ability of retailers to exploit the resulting market may be limited both by the ability of consumers to obtain competing products from other manufacturers. (*Continental T.V., Inc.*, 433 U.S. at 54, 53 L. Ed. 2d at 582-83, 97 S. Ct. at 2559.) Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of its products. (*Continental T.V., Inc.*, 433 U.S. at 54, 53 L. Ed. 2d at 582-83, 97 S. Ct. at 2559.) Manufacturers use vertical restrictions to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products; service and repair are vital for many products, and the availability and quality of such services affect a manufacturer's goodwill and the competitiveness of its product. (*Continental T.V., Inc.*, 433 U.S. at 55, 53 L. Ed. 2d at 583, 97 S. Ct. at 2560.) Marketing efficiency is not the only legitimate reason for a manufacturer's desire to exert control over the manner in which its products are sold and serviced; because society increasingly demands that manufacturers assume direct responsibility for the safety and quality of their products, vertical restrictions have been justified on the basis of the legitimacy of these concerns. *Continental T.V., Inc.*, 433 U.S. at 55 n.23, 53 L. Ed. 2d at 583 n.23, 97 S. Ct. at 2560 n.23.

In determining whether a defendant's conduct unreasonably restrains competition, courts must consider the nature of the defendant's activity, the purpose of the defendant, and the probable or actual effect on the industry in general and on competition within that industry. (*Board of Trade v. United States* (1918), 246 U.S. 231, 238, 62 L. Ed. 683, 687, 38 S. Ct. 242, 243.) When examining vertical restrictions such as customer or territorial restraints, courts look for harm to interbrand competition, and an alleged adverse effect on intrabrand competition does not make such a restraint unreasonable. *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.* (6th Cir. 1988), 854 F.2d 802, 806-07.

In the instant case, plaintiff did not establish that the 1990 parts policy had an adverse effect on interbrand competition. Thus, the trial court did not err in determining that plaintiff failed to show that the 1990 parts policy had unreasonable exclusionary or anticompetitive effects.

We hold that the trial court correctly concluded plaintiff failed to allege sufficient facts to establish that Caterpillar willfully acquired or maintained its market power, causing unreasonable, exclusionary, or anticompetitive effects. Consequently, we need not address

plaintiff's claim that it presented sufficient evidence to establish a relevant market or that Caterpillar possessed monopoly power in that relevant market. See *Trans Sport, Inc.*, 964 F.2d at 188.

Because we affirm the trial court's grant of summary judgment in favor of Caterpillar on each of plaintiff's antitrust claims, we need not review the trial court's finding that plaintiff failed to establish that it had suffered an antitrust injury.

■ Finally, we address plaintiff's claim that the trial court erred in granting summary judgment on plaintiff's claims of tortious interference with contractual relations or with prospective economic advantage.

In order to establish claims for tortious interference with contractual relations or with prospective economic advantage, plaintiff was obligated to present evidence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the interferer, an intentional interference inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the party whose relationship or expectancy has been disrupted. *K&R Leasing Corp. v. General Motors Corp., Oldsmobile Division* (N.D. Ill. 1982), 551 F. Supp. 842, 849; *Tru-Link Fence Co. v. Reuben H. Donnelley Corp.* (1982), 104 Ill. App. 3d 745, 751, 432 N.E.2d 1188; *City of Rock Falls v. Chicago Title & Trust Co.* (1973), 13 Ill. App. 3d 359, 362-63, 300 N.E.2d 331.

Plaintiff argues that the 1990 export parts policy interfered with plaintiff's contractual relationship with Patten. We hold that this argument is without merit where the affidavit of Larry O'Neill, general parts manager of Patten, stated that plaintiff did not have any contract with Patten and had merely purchased parts over the counter for 13 months. See *IK Corp. v. One Financial Place Partnership* (1990), 200 Ill. App. 3d 802, 818, 558 N.E.2d 161.

Plaintiff also contends that the export parts policy amounted to a tortious interference with its prospective economic advantage. We must reject this contention where the plaintiff failed to present any evidence that it had a reasonable expectancy of entering into a valid business relationship with Patten or that a contractual arrangement with Patten was contemplated. See *Stefani v. Baird & Warner, Inc.* (1987), 157 Ill. App. 3d 167, 175-76, 510 N.E.2d 65; *Heying v. Simonaitis* (1984), 126 Ill. App. 3d 157, 162, 466 N.E.2d 1137.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNAMARA and RAKOWSKI, JJ., concur.