2023 IL App (1st) 220081-U

SIXTH DIVISION
June 16, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* THE MARRIAGE OF | ) | |
| | ) | Appeal from the |
| MARGARET D. BEDFORD, n/k/a | ) | Circuit Court of |
| Margaret DiMatteo, | ) | Cook County. |
| | ) | |
| Petitioner-Appellant, | ) | No. 17 D 008682 |
| | ) | |
| and | ) | Honorable |
| | ) | Robert W. Johnson, |
| HOWARD E. BEDFORD, | ) | Judge Presiding. |
| | ) | |
| Respondent-Appellee. | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices C.A. Walker and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court abused its discretion in characterizing two bank accounts as marital property and this matter is remanded to the circuit court for the limited purpose of reconsidering the distribution of the marital estate. Petitioner's argument that it was error for the trial court not to impose sanctions on respondent is forfeited, and petitioner's other claims of error are without merit.

¶ 2    The petitioner in this case, Margaret DiMatteo, appeals an amended judgment for dissolution of marriage. She raises nine arguments challenging the court's reasoning on a range of issues including the award of maintenance to the respondent, Howard Bedford, the distribution of

certain marital assets, the court's classification of which assets were marital and which were not, attorney fees, and a request for sanctions. Most of these arguments are without merit, but we agree with Margaret that the court improperly characterized two bank accounts as marital property. Accordingly, we affirm in part and reverse in part, and remand for further limited proceedings.

¶ 3                                    I. BACKGROUND

¶ 4                          A. The Parties' Marriage and Finances

¶ 5      Margaret DiMatteo and Howard Bedford were married on June 17, 1989, in Lake Forest, Illinois. They have two children, both of whom were emancipated adults at the time of their divorce. The parties also raised Margaret's son from a previous marriage, who was 11 years old at the time she and Howard married. On October 10, 2017, Margaret filed a petition for dissolution of marriage, alleging the grounds of irreconcilable differences.

¶ 6      When the court entered its initial judgment for dissolution of marriage on March 4, 2021, Margaret and Howard were both 68 years old. Howard was employed as the Chief Executive Officer (CEO) of Bedford Paper. Margaret has not been employed since 1995, when she left the workforce to raise the parties' children.

¶ 7      Margaret's father, Dominick DiMatteo, was the founder of the regional supermarket chain Dominick's Finer Foods. When Dominick's was sold in 1995, proceeds from the sale funded the DiMatteo Trust, a generation-skipping trust Mr. DiMatteo set up for his children and their descendants. Goldman Sachs Trust Company (Goldman) took over as trustee of the DiMatteo Trust in 2013. Under the terms of the trust, Margaret does not have the ability to demand distributions of the trust's assets to herself. However, she, or someone acting on her behalf, can submit a budget and request specific monthly or yearly distributions, which an advisory committee at Goldman has the final authority to approve or deny. During their 31 years of marriage, the bulk

of the parties' money came from regular payments from the DiMatteo Trust.

¶ 8    Sometime in the mid-to-late 1990s, Margaret began receiving tax-free monthly distributions from her beneficial interest in the trust. She would typically receive $100,000 a month, but some months she requested and received as much as $165,000. According to trial testimony from Tim Foley, a private wealth manager at Goldman who helped administer the trust, to his knowledge, Goldman had never refused an amount requested by Margaret. Mr. Foley also explained that despite these monthly six-figure disbursements, the total portfolio value of the DiMatteo Trust has grown every year, except in 2018, when it decreased slightly due to what Mr. Foley described as "a very difficult year in the markets."

¶ 9    Since Goldman took over as trustee in 2013, the total value of the portfolio has increased by at least $10 million, and by 2020, according to Mr. Foley, the value of the assets in the DiMatteo Trust was "north of $40 million." The trial court found the value of these assets to be roughly $44 million.

¶ 10    The parties relied on these regular trust distributions to fund their lifestyle, which Margaret characterizes in her brief as "comfortable" and "worry-free." During their marriage, the parties maintained three residences: their marital residence in Winnetka, Illinois (which was sold for $4.2 million soon after the commencement of the divorce); a second home in an exclusive, ocean-side area of North Palm Beach, Florida, worth an estimated $6.2 million; and a condominium in Ocean City, Maryland, worth $250,000.

¶ 11    Their home in Winnetka housed a wine collection, which Howard took when the house was sold and later auctioned off for $228,610. They also owned a high-end wine shop in Northbrook, Illinois, and the commercial building that housed it. As Howard explained in his testimony, the wine store was never particularly profitable, but it allowed them to have easy access

3

to good wines.

¶ 12    The parties and their children travelled frequently, taking regular trips to Florida for holidays and school vacations, as well as ski trips to Colorado, yachting trips in the Caribbean, and trips abroad. The parties maintained memberships at three country clubs (two in Florida, one in Illinois). They often travelled by private jet. In addition to family trips, Howard would also take annual fishing trips to Alaska and the Bahamas.

¶ 13    While Howard was not a beneficiary of the DiMatteo Trust, and not legally entitled to any of its assets, he was involved in Margaret's distribution requests. According to Margaret's trial testimony, her husband largely managed the family's finances during their marriage and was typically the person to make the proposed budgets and tender them to the trustee. She testified that from the beginning of their marriage, Howard insisted that the family maintain one unified checking account. This meant that Margaret's monthly trust distributions were directly deposited into a joint checking account held in both their names. Howard's income also went into this joint account. Howard also testified that he deposited into the joint account periodic gifts from his father, which over the years amounted to $2.5 million.

¶ 14    Overall, Howard's contributions to the account were less substantial and more sporadic than Margaret's. When the parties were first married, Howard worked as a financial consultant at Cigna. He then left Cigna to start his own business, the Bedford Group, which he operated for a few years. According to Margaret, Howard's "active involvement in the Bedford Group ended shortly after [she] started receiving distributions from the DiMatteo Trust." By 2000, Howard closed the Bedford Group for good and began to pursue other interests. He became an avid aviation hobbyist, for example, taking flying lessons and even buying an airplane. Margaret alleges that she was not consulted in advance about the purchase of that first airplane. Over the course of their

4

marriage, the family would own six planes, the last of which Howard purchased for $11 million and later re-sold in 2014 for $3 million.

¶ 15    Sometime in the early 2000s, Howard started a small aviation company. He and two other pilots flew clients on chartered trips. While the company provided his family with access to aircraft for their travel needs, Howard received no salary and eventually wound down the business. Margaret claims in her brief that during the 14 years Howard ran the aviation company, "he did not receive 1099 or W-2 income for any of the over 1,000 flights he personally flew." Howard himself testified that he did not bring in any W-2 income from when he left the Bedford Group in the late 1990s until 2016.

¶ 16    In 2012 or 2013, Howard purchased a 49% stake in a Wisconsin-based paper company (which would later be renamed Bedford Paper) using money from the shared account. By the time of the divorce, Howard owned 60% of Bedford Paper and served as its CEO, where he worked around 100 hours per month and collected an annual salary of $125,000. This was his reported salary at the time of trial. Margaret's brother and her brother-in-law controlled the remaining 40% of the company (each possessing a 20% interest).

¶ 17    Howard's access to Margaret's monthly trust income, which he had relied on to sustain his living expenses, ended shortly after Margaret filed her petition for dissolution of marriage. Margaret opened a new checking account with Chase Bank (the Chase account) for her trust distributions. To open that account, she made an initial transfer of $100 from the parties' shared checking account.

¶ 18    As the balance of that new checking account began to accumulate, Margaret then decided to open another account (the Goldman account) so that she could earn more interest on any money she was not spending. On October 15, 2018, she funded the Goldman account with an initial

transfer of $500,000 from the Chase account. On June 7, 2019, she made a second transfer in the amount of $400,000.

¶ 19                                    B. Trial Court Proceedings

¶ 20     Margaret filed her petition for dissolution of marriage on October 10, 2017. After 17 days of trial—which took place over the course of more than three years due mostly to disruptions caused by the COVID pandemic—the trial court entered its initial judgment on March 4, 2021. The court awarded Margaret as her non-marital property the full value of the assets in the DiMatteo Trust, the Chase account, and the Goldman account, as well as several other assets not relevant to this appeal. For her portion of the marital estate, Margaret was awarded the wine shop in Northbrook, the commercial building housing the wine shop, and the home in Florida.

¶ 21     In the initial judgment, Howard was awarded as marital property the 60% interest in Bedford Paper, the condominium in Ocean City, Maryland, and several other accounts and assets. In total, Howard received $5,540,346 in marital assets while Margaret received $4,426,007, for an overall percentage allocation of about 56%-44% in favor of Howard. The court also awarded Howard permanent maintenance in the amount of $20,000 per month.

¶ 22     Howard filed a motion to reconsider on April 2, 2021, challenging several allocation determinations made by the court. Following briefing and argument, the court granted Howard's motion and issued an amended judgment on June 15, 2021, reclassifying the Chase and Goldman accounts as marital assets and awarding the wine shop and the commercial property housing it to Howard rather than Margaret. This altered the overall allocation of marital assets by approximately one percent, with $5,078,913 (57%) awarded to Howard and $3,782,255 (43%) to Margaret.

¶ 23     Margaret filed a motion to reconsider the amended judgment, which the court denied on December 17, 2021. This appeal followed.

¶ 24                                    II. JURISDICTION

¶ 25     The court denied Margaret's motion to reconsider on December 17, 2021. She timely filed a notice of appeal on January 14, 2022. This court has jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 26                                    III. ANALYSIS

¶ 27     Margaret presents an array of arguments on appeal challenging various decisions made by the trial court. In addition to complaints about Howard's lack of credibility that permeate her brief, Margaret asserts that the trial court erred in the following specific ways: (1) awarding Howard permanent maintenance; (2) refusing to allocate to Howard—either in the form of dissipation or as a pre-judgment distribution of marital assets—$771,100 that he took from the marital estate during the pendency of the divorce proceedings; (3) refusing to assign 100% of the liability to Howard for a judgment entered against him in a commercial lawsuit related to his activities as the CEO of Bedford Paper; (4) reclassifying the Chase and Goldman accounts as marital; (5) reassigning the wine shop and the building that houses it to Howard; (6) failing to enter sanctions against Howard for filing a false financial disclosure; and (7) awarding Howard a $60,000 contribution for attorney fees and costs. We will address these issues in turn.

¶ 28                                    A. Howard's Credibility

¶ 29     Margaret's overarching refrain on appeal is that "Howard Bedford has no credibility." She highlights a few anecdotes from the extremely lengthy trial record which she claims suggest that the trial court also found Howard to be unreliable. She then asserts that "since credibility is key in assessing a witness's testimony and evidence, this Court should view all of Howard's claims with a jaundiced eye." She states in her reply brief, however, that she "is not asking this Court to reverse

or alter the trial court's credibility determinations."

¶ 30    As the trier of fact, the trial court was clearly in a superior position to judge the parties' credibility and determine the weight to give to their testimony. See *Buckner v. Causey*, 311 Ill. App. 3d 139, 144 (1999). As Howard points out, the trial court never made an express finding of his credibility in this case. We must presume that the court's rulings reflect its weighing of all the appropriate concerns, including the relative credibility of the parties, and we consider those rulings on appeal in light of the applicable standard of review, which, as we discuss throughout this order, is whether the trial court abused its discretion in any of its rulings or made a finding that was against the manifest weight of the evidence. Except for its recharacterization of the Chase and Goldman accounts as marital property on the motion to reconsider, we find it did not.

¶ 31                                B. Maintenance

¶ 32    Section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) authorizes the circuit court in a dissolution of marriage proceeding to "grant a maintenance award for either spouse in amounts and for periods of time as the court deems just." 750 ILCS 5/504(a) (West 2020). The statute sets forth numerous factors for the court to consider when determining whether to grant maintenance, including:

    "(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

    (2) the needs of each party;

    (3) the realistic present and future earning capacity of each party;

    (4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or

8

delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." *Id.*

As our supreme court explained in *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005), "[t]he propriety of a maintenance award is within the discretion of the trial court and the court's decision will not be disturbed absent an abuse of discretion." An abuse of discretion exists only where the court's ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the

9

view adopted by the trial court. *In re Marriage of LaRocque*, 2018 IL App (2d) 160973, ¶ 94.

¶ 33    Margaret argues that the trial court's award of permanent maintenance to Howard in the amount of $20,000 per month amounted to an abuse of discretion because it did not fully consider Howard's wealth and his ability to generate more income to cover his living expenses. We disagree. While Margaret is correct that the court's maintenance decision should reflect the parties' income and present and future earning capacities, those factors are no more or less important than the other 13 factors. In this case, the court's maintenance award does not strike us as unreasonable in light of some of these other factors, specifically factors five (impairment of the realistic present or future earning capacity of the party against whom maintenance is sought), seven (the standard of living during the marriage), eight (the duration of the marriage), and nine (the age, health, station, occupation, etc. of each of the parties).

¶ 34    Margaret and Howard were married for over three decades, during which time they enjoyed what Margaret herself refers to as a comfortable and worry-free lifestyle. She argues that if he wanted to, Howard could earn more income as CEO of Bedford Paper to continue to pay for the lifestyle he became accustomed to during their marriage. But Howard is a man in his 70s who suffers from polymyalgia rheumatica, a condition which impacts his ability to work and will likely progress as he gets older. Margaret does not describe any marketable skills that Howard possesses at this stage of his life. From the record, it appears that he has not had a steady, full-time job since the 1990s, when, as Margaret explains in her brief, he largely exited the workforce and began to use his "access to [her] trust distributions to indulge in his own hobbies."

¶ 35    As we explained in *In re Marriage of Lenkner*, 241 Ill. App. 3d 15, 25 (1993), while the optimal goal of maintenance is for the dependent former spouse to become financially independent, in divorces "involving former spouses with grossly disparate earning potentials, this

10

goal is often not achievable in light of the dependent former spouse's entitlement to maintain the standard of living established during the marriage." In such cases, "the goal of financial independence must be balanced against a realistic appraisal of the likelihood the spouse will be able to support [him]self in some reasonable approximation of the standard of living established during the marriage." *Id.* Here, even if Howard were able to increase his salary as CEO of Bedford Paper—a somewhat dubious proposition based on trial testimony about the finances of Bedford Paper—he would still be a long way from achieving any semblance of the standard of living he and Margaret enjoyed during their 31-year marriage.

¶ 36    Additionally, this maintenance award does not significantly impair Margaret's realistic present or future earning capacity. Simply put, she can afford it. Twenty-thousand dollars a month represents just one-fifth of a typical monthly disbursement from her interest in the DiMatteo Trust, the assets of which, as trial testimony established, have only grown in value since she started taking money out of it over two decades ago. Barring any intervening events, Margaret can expect to continue receiving these payments indefinitely, regardless of her health or ability to work. Howard has no comparable guarantee of financial stability as he enters into advanced age and his health worsens.

¶ 37    In sum, because a number of the factors in section 504 of the Act weighed in favor of granting Howard a significant maintenance award, the court did not abuse its discretion when it awarded him maintenance of $20,000 per month.

¶ 38                    C. $771,100 in "Substitute Maintenance"

¶ 39    Margaret next argues that the trial court erred by not assessing against Howard the $771,110 in marital cash that she claims he drained from the marital estate while the divorce proceedings were underway. She argues that the court should have viewed this as either dissipation

11

or as a pre-distribution of marital assets. She asserts that the court's failure to adequately reckon with this cash grab from their joint accounts resulted in an unjustifiable windfall for Howard.

¶ 40    A trial court's finding regarding the allocation of marital property, including making allowances for dissipation, will not be reversed absent an abuse of discretion. *In re Marriage of Petrovich*, 145 Ill. App. 3d 881, 886 (1987). We see no abuse of discretion here.

¶ 41    The trial court in this case was well aware of the $771,100 in cash that Howard took from the marital estate during the divorce proceedings. There is a section of the initial judgment titled "marital funds accessed by Howard" which directly addresses the topic and where the court acknowledged that Howard provided no proof as to how he spent this money. The court then explained that it considered that money to be a "pre-distribution" to Howard, a ruling which implicitly rejected Margaret's dissipation claim. However, later on, in the section denying Howard's petition for temporary maintenance, the court further explained that "[g]iven the substantial amount of cash Howard had access to during these proceedings, approximately $771,000, established by Howard's testimony of his spending in defense of Margaret's dissipation claim, temporary maintenance was unwarranted." Read together, these two statements are somewhat confusing, as the court seemed to suggest that this $771,000 sum was simultaneously a pre-distribution and a *de facto* form of temporary maintenance, the existence of which helped justify its decision to deny Howard's emergency petition for temporary maintenance.

¶ 42    However, any ambiguity as to how the court viewed these funds was remedied in the court's June 15, 2021, order granting Howard's motion to reconsider. The court clarified in that order that it had "considered Howard's access to $771,000 in marital funds in denying Howard temporary maintenance. The same $771,000 cannot be considered a pre-distribution to Howard and shall be removed from the Marital Balance Sheet." Thus, in the court's view, this $771,000

was neither dissipation nor a pre-distribution, but money that Howard was entitled to as a form of maintenance to keep him afloat during the proceedings. Margaret has not met her burden of showing that this decision amounted to an abuse of discretion.

¶ 43                    D. The Civil Judgment Against Howard

¶ 44    Margaret next challenges the trial court's ruling assigning liability in a civil judgment entered against Howard to the marital estate rather than to Howard individually. Howard was found liable for $741,000 in a commercial dispute stemming from his role as CEO of Bedford Paper. Margaret asserts that she had nothing to do with that lawsuit and that she was unaware of the litigation until after the judgment was entered. Further, the judgment was not entered until September 2018, "almost a full year into the dissolution of marriage proceedings." In other words, she argues, "[t]his debt was incurred, *by Howard*, long after the marriage had broken down." (Emphasis in original.)

¶ 45    The timeline Margaret highlights is not dispositive of whether this debt is a part of the marital estate. Section 503(b)(1) of the Act sets forth a presumption that all property—*including debts and other obligations*—acquired by either spouse after the marriage begins and before a judgment of dissolution of marriage has been entered is marital property. 750 ILCS 5/503(b)(1) (West 2020). That presumption is only rebuttable with clear and convincing evidence that the property was acquired by a method listed in subsection (a) of section 503, which delineates categories of property considered to be non-marital. See *Id.* § 503(a). Margaret has not rebutted this presumption.

¶ 46    The civil judgment against Howard, entered after the marriage and prior to dissolution, was presumptively part of the marital estate. The trial court seemingly viewed this liability as inseparable from the parties' interest in Bedford Paper, which was indisputably part of the marital

estate. This was not an unreasonable conclusion to draw based on testimony heard by the court, where Howard discussed the origins of the lawsuit. In short, the litigation stemmed from the aborted purchase of two machines for Bedford Paper during the period of time that Howard was taking over the company from its previous owner. Margaret does not provide any convincing evidence to the contrary. She argues that Howard committed "accounting trickery" to disguise his personal liability as a Bedford Paper business expense, but her argument is confusing and difficult to understand. She highlights the fact that the lawsuit named Howard personally, and not Bedford Paper (or the company's prior name, Straubel Paper) as the defendant, but this fact alone does not prove that this liability was not a Bedford Paper business expense.

¶ 47    In sum, the trial court did not abuse its discretion in ruling that the judgment entered against Howard was part of the marital estate.

¶ 48                     E. The Chase and Goldman Accounts

¶ 49    Margaret next argues that the trial court erred when, in its amended judgment, it reclassified the Chase and Goldman accounts as marital property.

¶ 50    A trial court's classification of property as marital or non-marital will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 68. Here, we agree with Margaret that the court's reclassification of these accounts was erroneous and against the manifest weight of the evidence.

¶ 51    The court changed its view of these accounts based upon a stipulation the parties had entered early in the proceedings, which stated the following:

    "Margaret hereby in open court, waives all claims that any asset is nonmarital except for

    Phone Jockey Investors FF4 and the Goldman Sachs/Dominick DiMatteo Jr. Irrevocable

    Trust and its current assets and income. As such, she is barred from claiming any asset is

14

nonmarital at trial except for the Phone Jockey Investors FF4 and the Goldman Sachs/Dominick DiMatteo Jr. Trust claims."

It appears that since the Chase and Goldman accounts were not similarly excepted from this stipulated understanding of the parties' marital property, the trial court considered any argument that the accounts were non-marital property to be waived by Margaret. This was an erroneous reading of the parties' stipulation.

¶ 52    Section 503(a)(1) plainly classifies "property acquired by gift, legacy or descent" as non-marital. 750 ILCS 5/503(a)(1) (West 2020). Here, not only does section 503(a)(1) establish a presumption that the DiMatteo Trust is non-marital, but the parties stipulated to this fact. As the court acknowledged in both of its judgments, "[t]he parties stipulate that Margaret's beneficial interest in the Dominick DiMatteo Jr. Irrevocable Trust FBO Margaret D. Bedford *** constitutes her non-marital property." The more specific language in the stipulation highlighted by Howard in his motion to reconsider also firmly establishes that Margaret's interest in the DiMatteo Trust—including any assets, income, and claims related to that trust—is non-marital property. It is irrelevant that the stipulation highlighted by Howard does not specifically name the Chase and Goldman accounts. *Income* from the DiMatteo Trust is Margaret's non-marital property, and the entire purpose of those accounts was to make that income available to her, and only to her.

¶ 53    Prior to opening the Chase account, Margaret's monthly trust disbursements were directly deposited into an account that Howard could access. After she filed for divorce, Howard used that access to withdraw significant quantities of cash from the shared account. This prompted Margaret to open the Chase account and reroute her monthly trust deposits to the new account, of which she was the sole owner. When the balance of that new account grew to more than she needed on a day-to-day basis, Margaret then opened the Goldman account, so that the excess funds could earn

interest. The obvious purpose of these accounts was to provide a safe home for Margaret's non-marital trust income beyond Howard's reach. In our view, these accounts are merely extensions of her beneficial interest in the DiMatteo Trust, and Howard has no claim to them.

¶ 54    We also disagree with Howard that the nature of the accounts was changed by the commingling of marital and non-marital property. When Margaret first opened the Chase account, she did so with a $100 transfer from the parties' shared account, where they had historically commingled their funds. Howard argues both that this evidenced "an intent to treat that account as marital" and that the $100 transmuted the Chase account into marital property. This *de minimis* transfer of $100 did not transmute the Chase and Goldman accounts into marital property.

¶ 55    As we explained in *Foster*, 2014 IL App (1st) 123078, ¶¶ 75, 79, there is no presumption that commingled property is always transmuted into marital property, and the fact that two different types of income are commingled in a joint account does not, by itself, "establish that the nonmarital inheritance income [is] transmuted into marital property." Further, the principle of transmutation " 'is based on the presumption that the owner of the nonmarital property intended to make a gift of the property to the marital estate.' " (quoting *In re Marriage of Olson*, 96 Ill. 2d 432, 439 (1983)). Here, as explained above, the record is clear that Margaret's intent in opening the Chase account was exactly the opposite of "making a gift to the marital estate"—she was trying to safeguard her non-marital property from Howard. These accounts should not have been reclassified as marital property, as their entire purpose was to secure income for Margaret from the DiMatteo Trust, which is indisputably Margaret's non-marital property.

¶ 56    Finally, Howard argues that even if these assets were incorrectly classified as marital, it does not matter because Margaret was ultimately allocated them in the distribution of the marital estate. Thus, "she was not deprived of the property based upon its classification." However, even

if Margaret was ultimately awarded title to these two accounts in the court's distribution of marital assets, the mere classification of these accounts as marital property increased the overall value of the marital estate by nearly $800,000, which may have impacted the court's other distribution decisions. As it is impossible for us to know the extent to which the court's erroneous classification of these accounts as marital property influenced the ultimate distribution of the marital estate, remand on this issue is required.

¶ 57                                 F. The Wine Shop

¶ 58    Margaret also argues that the court erred when it changed its mind and awarded the wine shop as marital property to Howard instead of her. The court provided no explanation for this decision, but Margaret suggests in her brief that it was "an apparent attempt to 'compensate' " Howard for recharacterizing the Chase and Goldman accounts as marital property and awarding them to Margaret. This strikes us as a plausible explanation for the court's decision. The recharacterization of the bank accounts resulted in the overall value of the marital estate increasing by $783,580.27. In light of this increase in value, all of which went to Margaret, the court likely felt that giving Howard the wine shop would keep the distribution equitable.

¶ 59    In any event, whichever party deserves the wine shop is an issue to be dealt with on remand, where the court must reconsider the distribution of marital assets between the parties now that those assets no longer include the Chase and Goldman accounts.

¶ 60                                 G. Sanctions

¶ 61    Margaret next argues that the court should have granted a motion she filed seeking sanctions against Howard on June 7, 2019, for filing an intentionally false and misleading preliminary financial disclosure with the court. The trial court apparently never addressed the motion and Margaret contends that "the judge should have issued significant sanctions against

17

Howard for his misrepresentation, and the failure to do so constituted an error of law." In response, Howard argues that it is Margaret, and not him, who deserves to be sanctioned.

¶ 62    In our view, remand is not warranted here as the issue is not properly preserved for appeal. As we explained in *Intercontinental Parts, Inc. v. Caterpillar, Inc.*, 260 Ill. App. 3d 1085, 1090 (1994), the failure to enter a ruling on a motion is not equivalent to a denial of the motion, and "a party who has filed a motion seeking certain relief from the court is obligated to obtain a ruling on that motion." Margaret forfeited review of this issue by failing to secure a ruling on her motion by the trial court.

¶ 63                                H. Attorney Fees

¶ 64    Margaret's final argument is that the trial court erred in awarding Howard a $60,000 contribution to his legal fees. She asserts that "Howard was responsible for many of the legal fees incurred in this case, and Howard has the ability to pay his own fees." A circuit court's decision to award attorney fees will not be disturbed absent an abuse of discretion. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 13. We find no abuse of discretion here.

¶ 65    Howard is certainly walking away from this marriage with substantial assets. But he need not prove that he is destitute to qualify for a contribution of attorney fees. Rather, "it is sufficient to show that payment would exhaust his estate or strip him of his means of support or undermine his economic stability." *In re Marriage of Minear*, 287 Ill. App. 3d 1073, 1085. At the time he filed his petition for legal fees, he had outstanding legal bills amounting to over $108,848.60, a sum which represents about 87% of his annual salary at Bedford Paper, or about 30% of his annual income once maintenance is factored in.

¶ 66    Further, as Howard notes in his brief, section 503(j)(2) of the Act states that "[a]ny award of contribution to one party from the other party shall be based on the criteria for division of marital

property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." 750 ILCS 5/503(j)(2) (West 2020). This provision makes clear that when deciding whether to grant a contribution, the court should consider the same equitable factors it considers when making a decision about maintenance (see *supra*, ¶ 32). In this case, as we discussed at length when we rejected Margaret's maintenance argument, a number of those factors unquestionably favor granting an award to Howard. Accordingly, the court did not abuse its discretion when it awarded Howard a $60,000 contribution from Margaret for legal fees.

¶ 67                                          IV. CONCLUSION

¶ 68     For the foregoing reasons, we affirm in part and reverse in part and remand the matter to the circuit court for the limited purpose of reconsidering its distribution of marital property in light of our ruling that the Chase and Goldman accounts are Margaret's non-marital property.

¶ 69     Affirmed in part and reversed in part; remanded with directions.