**TRANS SPORT, INC., Plaintiff–Appellant,**

v.

**STARTER SPORTSWEAR, INC., Defendant–Appellee.**

**No. 810, Docket 91–7915.**

United States Court of Appeals, Second Circuit.

Argued Jan. 21, 1992.

Decided May 20, 1992.

Peter H. Bouman, Richard W. Mertens, Binghamton, N.Y. (Coughlin & Gerhart) for plaintiff-appellant Trans Sport, Inc.

Kenneth A. Payment, Carol L. O'Keefe, Rochester, N.Y. (Harter, Secrest & Emery) for defendant-appellee Starter Sportswear, Inc.

Before NEWMAN and KEARSE, Circuit Judges, and MARSHALL, Associate Justice Retired.[1]

MARSHALL, Associate Justice Retired:

In this case, we review a district court's grant of summary judgment awarded to a manufacturer charged with violating § 2 of the Sherman Act, 15 U.S.C. § 2.[2] 775 F.Supp. 536. The question presented is whether a manufacturer may, consistent with federal antitrust laws, impose restraints on, and refuse to deal with, an authorized retailer that sells the manufacturer's products to other dealers. On the facts before us, we hold that it can.

I

Since 1976, defendant-appellee Starter Sportswear, Inc. ("Starter") has had a license to manufacture and sell satin team jackets bearing the trademark of the four professional sports leagues: Major League Baseball (MLB), the National Football League (NFL), the National Hockey League (NHL) and the National Basketball Association (NBA). These jackets are marketed as "authentic" jackets because they are the style of jacket actually worn at the athletic event by the players, coaches, referees, and support personnel. App. 96. Each of the four leagues has trademarked its authentic jacket styles: MLB has its "Diamond Club;" the NFL has its "Pro Line;" the NHL has its "Center Ice;" and the NBA has its "NBA Authentic." Exh. to App. 205. While numerous manufacturers are licensed to produce a smorgasbord of league merchandise, including jackets, bearing the teams' official trademarks, only Starter and a handful of other companies are licensed to manufacture and sell authentic team jackets nationwide.

The Stickley Corporation ("Stickley"), the predecessor-in-interest to plaintiff-appellant Trans Sport, Inc. ("Trans Sport"), sold Starter's authentic team jackets on a retail basis. This dispute arose when, after about six months of retail sales, Stickley began reselling Starter's authentic jackets to other retailers nationwide. Stickley perceived a business opportunity created by Starter's policy of requiring its retailers to place a minimum order. By eliminating the minimum order requirement for Stickley's customers, Stickley was able to provide special order or out-of-season product to them, a service for which it imposed a $7–per–jacket mark-up.

In March 1987, Starter's national sales manager advised Stickley that Starter would discontinue its business with Stickley if Stickley did not limit its resale of Starter team jackets to sales through a consumer catalog and from Stickley's retail store. Starter refused to ship Stickley's Fall 1987 order of jackets unless Stickley agreed not to distribute Starter's products to other retailers. When Stickley refused to comply, Starter inserted the following conditions in its new order forms:

> No Transshipments: Starter has a policy of selling only directly to selected retail outlets for resale by them at specified locations. Proposed sale at any new retail outlet requires advance written approval from Starter's Home Office. Resale or transshipments of our merchandise to an unauthorized location or to another business contravenes that policy and the items and conditions of sale and may result in nonshipment or termination of the retailer's business relationship with Starter. Exh. to App. 470.

When Starter refused to honor outstanding orders from Stickley after February 16, 1987, Stickley's sister corporation, Trans Sport, filed suit under § 2, seeking treble damages and injunctive relief. Trans Sport alleged that Starter had monopoly power in the market for authentic jackets and that it intentionally used its monopoly power to eliminate Stickley as a competitor at the distributor-wholesaler level in violation of

---

1. Honorable Thurgood Marshall, Associate Justice Retired of the Supreme Court of the United States, sitting by designation.

2. The statute provides, in relevant part:
   Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony.... 15 U.S.C. § 2 (1982).

§ 2. Trans Sport also alleged that Starter's actions were intentionally taken to maintain artificially high prices at the consumer level, that Starter knowingly maintained monopoly power at the distributor-wholesaler level, and that because of Starter's refusal to deal, Trans Sport could not obtain and supply the products necessary to service the retail market for authentic team jackets.

Starter moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). The District Court denied the motion. App. 34. After two years of discovery, Starter moved for summary judgment. It argued that Trans Sport could not sustain its § 2 action because Starter did not have monopoly power in the relevant market and that even if it possessed monopoly power in the jackets it manufactured, it had not caused unreasonable anti-competitive effects. The District Court granted Starter's motion for summary judgment. App. 363.

Relying in part on the Supreme Court's decisions in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985) and *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), the court noted that to sustain a § 2 claim, a plaintiff must prove that the defendant (a) possesses monopoly power in the relevant market and (b) has acquired or maintained that power willfully rather than through growth and development as a consequence of a superior product, business acumen, or historic accident. App. 353. The court did not decide whether Starter possessed monopoly power in the relevant market because it held that even assuming *arguendo* that Starter had such power, "preventing plaintiff from continuing in the wholesale distribution market does not constitute the unreasonable exercise of defendant's distribution monopoly power under federal antitrust law." *Id.* at 352–53.

We review the District Court's grant of summary judgment de novo.

*Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). Viewing the evidence in the light most favorable to the nonmoving party, we determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *Id.* "Once the movant has established a *prima facie* case demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely ... on the basis of conjecture or surmise." *Id.* Because we agree with the District Court that Trans Sport cannot sustain its § 2 claim, we affirm.

## II

Ordinarily, under the first prong of the test articulated in *Aspen Skiing*, 472 U.S. at 596 n. 19, 105 S.Ct. at 2854 n. 19, and *Grinnell Corp.*, 384 U.S. at 570–71, 86 S.Ct. at 1704, we would first determine the relevant market and then decide whether Starter possessed monopoly power in that market. In this case, however, we do not pursue such an inquiry because we agree with the District Court that even if Starter possessed monopoly power in the relevant market, however construed,[3] Trans Sport's § 2 claim cannot prevail.

To sustain a § 2 claim, the plaintiff must prove not only that the defendant had the power to monopolize, see *Aspen Skiing*, 472 U.S. at 602 n. 28, 105 S.Ct. at 2857 n. 28, but also that it willfully acquired or maintained its power, *Volvo N. Amer. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 73 (2d Cir.1988), thereby causing unreasonable " 'exclusionary,' " or " 'anticompetitive' " effects. *Aspen Skiing*, 472 U.S. at 602, 105 S.Ct. at 2857 (citation omitted). Proof of willful intent and unreasonable exclusionary or anticompetitive effects is required to allow a trier of fact to distinguish "between conduct that defeats a competitor because of effi-

---

**3.** Trans Sport contends that the relevant market consists of the market for authorized team jackets alone, while Starter claims that the relevant market is the market for League apparel generally, of which, it argues, the authentic jackets are only a portion.

ciency and consumer satisfaction, and conduct that 'not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.' " *United States Football League v. National Football League,* 842 F.2d 1335, 1359 (2d Cir.1988) (quoting *Aspen Skiing,* 472 U.S. at 605 n. 32, 105 S.Ct. at 2859 n. 32 (quoting 3 P. Areeda & D. Turner, Antitrust Law 78 (1978))). If a company has " 'attempt[ed] to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory." *Aspen Skiing,* 472 U.S. at 605, 105 S.Ct. at 2859 (citation omitted).

### A

■ Trans Sport contends that Starter's no-transshipment policy and refusal to deal with Trans Sport unless it agreed not to sell Starter products to other dealers establish Starter's willful intent to exclude intrabrand competition. This claim is without merit.

Starter acquired its right to manufacture authentic jackets through various licensing agreements with the Leagues. App. 37–38, 67. Starter's licenses are of limited duration and may be terminated or not renewed if the Leagues are dissatisfied with Starter's products or performance. *Id.* at 41, 67, 83; Exh. to App. 582, 586–87. Rival manufacturers can, and apparently do, compete with Starter to gain the right to manufacture and distribute authentic jackets. Although Starter has been granted a license to manufacture authentic jackets since 1976, the accumulation of such licenses is not, in and of itself, unlawful. *See Automatic Radio Mfg. Co., Inc. v. Hazeltine Research, Inc.,* 339 U.S. 827, 834, 70 S.Ct. 894, 898, 94 L.Ed. 1312 (1950). As we have consistently made clear, "[s]uccess alone is not enough [to sustain an antitrust claim] or the antitrust laws would have their greatest impact on the most efficient entrepreneurs and would injure rather than protect consumers." *National Football League,* 842 F.2d at 1359.

Trans Sport has alleged no facts from which a trier of fact could infer that Start-er's subsequent decision to prevent authorized retailers from selling to other dealers was purposefully designed "to fix prices or to exclude competition," *Int'l Railways of Cent. America v. United Brands Co.,* 532 F.2d 231, 239 (2d Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 101, 50 L.Ed.2d 100 (1976). To be sure, Starter's no-transshipment policy and refusal to deal allow it to control the universe of dealers that may compete in the market for Starter products. Such control, in turn, impedes the ability of authorized retailers, such as Trans Sport, to enter the wholesale market and thereby reduces the aggregate number of dealers—retail and wholesale—competing to sell Starter jackets. Restrictions on intrabrand competition invariably reduce competition, and may, therefore, result in a higher aggregate market price for Starter jackets.

These facts alone, however, do not establish any genuine issues of material fact; nor do they entitle Trans Sport to judgment as a matter of law. As the Supreme Court has made clear, " *'[i]n the absence of any purpose to create or maintain a monopoly,* the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.' " *Aspen Skiing,* 472 U.S. at 602, 105 S.Ct. at 2857 (quoting *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919) (emphasis supplied)). *See also Bowen v. New York News, Inc.,* 522 F.2d 1242, 1254 (2d Cir.1975), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976) ("manufacturer has the right unilaterally to choose the customers with whom he may deal") (citing *Colgate,* 250 U.S. at 307, 39 S.Ct. at 468).

Moreover, Trans Sport has offered no evidence to cast doubt on the legitimate business justifications Starter proffers for its intrabrand restrictions. Such justifications prevent a rational trier of fact from finding § 2 liability. *See, e.g., National Football League,* 842 F.2d at 1360 (no § 2 liability where network's actions were based on desire "to obtain $736 million in rights fees, not to exclude competitors");

*Byars v. Bluff City News Co., Inc.,* 609 F.2d 843, 862 n. 52 (6th Cir.1980) ("valid business purpose can offset a finding of monopolistic intent") (citations omitted). *See also Aspen Skiing,* 472 U.S. at 608, 105 S.Ct. at 2860 (finding § 2 violation where company's refusal to deal was not supported by "any efficiency justification whatever for its pattern of conduct"); *United States v. Paramount Pictures,* 334 U.S. 131, 174, 68 S.Ct. 915, 937, 92 L.Ed. 1260 (1948) (Sherman Act violation if company engages in "calculated scheme to gain control over an appreciable segment of the market and to restrain or suppress competition, rather than an expansion to meet legitimate business needs."); *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 375, 47 S.Ct. 400, 404, 71 L.Ed. 684 (1927) (absence of valid business justification for manufacturer's refusal to sell to dealers at wholesale is grounds for imposing antitrust liability).

Among other justifications, Starter contends that its no-transshipment policy and refusal to deal allow it to select only those retailers that are consistent with the quality and image it wishes to project for its products and that are willing to make the long-term investments in advertising, point-of-purchase displays and promotions to promote sales growth. App. 51–54, 64–65. In addition, Starter argues, its policy allows it to better identify and combat counterfeit Starter goods. *Id.* at 53, 65.

These valid business rationales are sufficient to establish a *prima facie* case of lawful conduct. A business may properly seek to maintain the image of its products by controlling where those products are sold, even if profit maximization is its ultimate objective. It also is legitimate for Starter to select only those retailers willing to make an economic investment in Starter products, while excluding other dealers unable or unwilling to make such a commitment. As the Supreme Court has recognized, restrictions on intrabrand competition:

> induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products.... The avail-

ability and quality of such services affect a manufacturer's goodwill and the competitiveness of his product. Because of market imperfections such as the so-called 'free-rider' effect, these services might not be provided by retailers in a purely competitive situation....

*Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 55, 97 S.Ct. 2549, 2560, 53 L.Ed.2d 568 (1977) (discussing claim brought under § 1 of Sherman Act). *See also Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 762–63, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984); Gerhart, *The 'Competitive Advantages' Explanation for Intrabrand Restraints, An Antitrust Analysis,* 1981 Duke L.J. 417, 443–444 (1981). Although consumers buying sports jackets clearly do not require the same level of service or safety guarantees as those buying such products as household appliances or automobiles, the intrabrand restrictions imposed by Starter nevertheless induce promotional efforts that "convey socially desirable information about product availability, price, quality, and services." *Continental T.V.,* 433 U.S. at 56 n. 25, 97 S.Ct. at 2560 n. 25.

Moreover, because a good's value "is a joint product of the manufacturer who makes it and the elite dealer who stamps it with fashionability," 8 P. Areeda, Antitrust Law ¶ 1613d, pp. 184–185 (1989), Starter's intrabrand restrictions also help to convey to consumers a message of quality; consumers with little knowledge of league products may find a surrogate for information "in the very fact that a dealer with a reputation for handling quality merchandise stocks a particular brand.... For some consumers, this is valuable information." *Id.*

Starter's conduct is further justified by its legitimate interest in combatting counterfeiting. Starter spent more than $200,000 combatting counterfeit products sold at unauthorized stores. App. 53 n. 6. By limiting the retailers that may sell its products, Starter can identify when putative Starter goods appear at unauthorized locations, and thereby better identify the presence and source of counterfeit goods.

Moreover, Starter's policy enables it to fulfill its agreement with the Leagues to police authentic products and protect their trademarks. *See Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,* 794 F.2d 38, 43 (2d Cir.1986).

Finally, Starter has a legitimate need to deal directly with its retailers in order to facilitate the forecasting of which sports teams will be most popular in the upcoming season, and thus, which team's jackets will be in the greatest demand. App. 51–52, App. 361. This forecasting promotes the efficient use of Starter's limited manufacturing resources.

Because these asserted business justifications are valid, the burden shifts to Trans Sport to allege facts that support an inference that the proffered justifications are merely pretextual, thereby establishing genuine issues of material fact requiring resolution at trial. See *Maffucci,* 923 F.2d at 982 (discussing summary judgment standard).

Trans Sport has not met this burden. To the contrary, as the District Court found, Trans Sport:

admits that [Starter] preferred to deal with the 'Macy's of the licensed apparel industry, not the K–Marts of the world,' Plaintiff's June 14, 1991 Memorandum at 41 ... as if this course of conduct were somehow wrongful, and has recognized that '*the place* where the jackets are sold was of apparent importance to Starter,' *id.* at 43 (emphasis supplied), as if a manufacturer, and particularly a manufacturer who has secured an exclusive right to manufacture goods under certain terms and conditions, should not be concerned with such matters.

App. 360–61. *See also* App. 364–67 (reprinting cited portions of Trans Sport's memorandum). These concessions support, rather than discredit, Starter's asserted interest in preserving its image and goodwill through intrabrand restrictions.

Trans Sport seeks to cast doubt on Starter's asserted interest in preventing discount dealers from "free-riding" off of the goodwill and services that authorized retailers provide by claiming that the services they offer are minimal. Although it is true, as Trans Sport contends, that authorized retailers do not offer demonstrations, warranties or repairs, they do make investments in advertising, point-of-purchase displays and promotions that foster sales growth. Although Trans Sport attempts to discredit this justification by pointing out that Starter authorized Trans Sport to sell authentic jackets by direct mail, this fact alone does not raise a genuine, triable issue. Trans Sport's direct-mail catalogs, which provide advertising for Starter products, serve Starter's interest in ensuring that its products are promoted. A trier of fact could not rationally infer from a decision to allow *authorized* retailers to engage in direct-mail sales that Starter excluded discount dealers in order "to fix prices or to exclude competition," *United Brands,* 532 F.2d at 239, or that Starter was " 'attempting to exclude rivals on some basis other than efficiency.' " *Aspen Skiing,* 472 U.S. at 605, 105 S.Ct. at 2859 (citation omitted). That a company takes reasonable steps to preserve its business interests cannot, without more, raise a genuine issue of material fact under § 2. *See United Brands,* 532 F.2d at 239–240 (rejecting § 2 claim where company's refusal to deal was supported by reasonable business justification); 7 Areeda, *supra,* at ¶ 1441a.

Moreover, we see no traces of the burdensome effects generally associated with illicit monopolistic activity: price maintenance or discrimination or increased barriers to entry at the manufacturing level. *See, e.g., Paschall v. Kansas City Star Co.,* 727 F.2d 692, 702–03 (8th Cir.) (en banc), *cert. denied,* 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984) (citations omitted); *Byars,* 609 F.2d at 861 (citing 3 Areeda & Turner, Antitrust Law ¶¶ 725, 726 (1978); Note, *Refusals to Deal by Vertically Integrated Monopolists,* 87 Harv.L.Rev. 1720 (1974)).

## B

■ Finally, Trans Sport claims that Starter established its no-transshipment policy in order to engage in illegal tying.

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.'" *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 684–85 (2d Cir.1982) (quoting *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). To defeat Starter's motion for summary judgment, Trans Sport must allege facts sufficient to support an inference that Starter had "appreciable economic power" in the tying product, *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 503, 89 S.Ct. 1252, 1259, 22 L.Ed.2d 495 (1969), and affected a substantial amount of commerce. *Id.* In other words, a reasonable trier of fact must be able to find "[a]ctual coercion by the seller that in fact force[d] the buyer to purchase the tied product...." *Unijax*, 683 F.2d at 685. However, "[a] manufacturer's use of 'strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce [its] retailer to buy its full line of products' does not ... amount to actual coercion." (citation omitted). *Id.* A reasonable jury will only find actual coercion where "the manufacturer goes beyond persuasion and conditions its retailer's purchase of one product on the purchase of another product." *Id.*

In alleging illegal tying, Trans Sport relies on a policy statement issued by Starter to its retailers indicating that Starter "has a policy of selling only to retail outlets which carry a representative amount of the *line* as deemed appropriate by Starter in light of the type of retail outlet, the status of Starter's line or lines of merchandise and marketing conditions." Exh. to App. 470 (emphasis added). This policy, Trans Sport argues, effectively forces retailers to buy Starter's other, non-authentic products, such as baseball caps, T–Shirts and other apparel, in order to maintain the right to sell Starter's authentic jackets.

These facts, alone, cannot defeat Starter's summary judgment motion. First, Starter's policy statement is ambiguous. Requiring retailers to carry a "representative *amount* of the line," *id.* (emphasis added) is not necessarily tantamount to

forcing dealers to carry a representative sample of the various products that Starter produces. Rather, retailers reading the statement could well conclude that Starter intended to limit its business to dealers willing to make a reasonable investment in Starter's "line" of authentic jackets. This ambiguity does not establish a triable issue of material fact because there is no indication that Starter's policy statement was ever translated into action in order to deliberately force retailers to buy authentic jackets. After two years of discovery, Trans Sport has presented no evidence that Trans Sport or any other dealers ever felt compelled to purchase Starter's non-authentic products in order to receive the authentic jackets. Nor does Trans Sport claim that Starter terminated sales to Trans Sport because Trans Sport refused to buy Starter's non-authentic products. In the absence of any evidence from which a trier of fact could infer actual coercion or willful intent to fix prices, Trans Sport's tying claim cannot prevail. As we have consistently made clear, "unless the buyer can prove that it was the unwilling purchaser of the allegedly tied products, actual coercion has not been established and a tying agreement cannot be found to exist." *Unijax*, 683 F.2d at 686.

## CONCLUSION

Because Trans Sport has presented no genuine triable issues of material fact relating to its § 2 claim, and because it cannot, on the facts alleged, establish exclusionary intent or unreasonable anticompetitive effects as a matter of law, we hold that the District Court properly awarded summary judgment to Starter.

The decision of the District Court is *affirmed.*