**XEROX CORPORATION, Plaintiff,**

v.

**MEDIA SCIENCES, INC., Defendant.**

**No. 06 Civ. 4872 (RJH).**

United States District Court,
S.D. New York.

March 30, 2009.

James Gerard McCarney, Howrey LLP, New York, NY, Jennifer L. Dzwonczyk, Jim W. Ko, Joseph P. Lavelle, Howrey Simon Arnold & White LLP, Washington, DC, for Plaintiff.

Anthony P. La Rocco, Kirkpatrick & Lockhart Preston Gates Ellis, LLP, Newark, NJ, Hunter D. Keeton, James J. Foster, Lawrence M. Green, Wolf, Greenfield & Sacks, P.C., Boston, MA, William N. Hebert, Seung Lee, Calvo & Clark, LLP, William H. Hebert, Kirkpatrick & Lockhart Preston Gates Ellis LLP, San Francisco, CA, for Defendant.

## MEMORANDUM OPINION AND ORDER

RICHARD J. HOLWELL, District Judge:

On September 14, 2007, this Court denied in part Plaintiff–Counterclaim Defen-

dant Xerox Corporation's ("Xerox") motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Defendant–Counterclaimant Media Sciences, Inc.'s ("Media Sciences" or "MS") counterclaims alleging monopolization and attempted monopolization in violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 (2006) (the "Sherman Act"), holding that Media Sciences pleaded facts sufficient to state antitrust claims on its theories challenging: (1) Xerox's redesigning and patenting of its solid ink sticks for use in its phase change color printers, and (2) its loyalty rebate program. *See Xerox Corp. v. Media Sciences, Intern., Inc.,* 511 F.Supp.2d 372, 387–90 (S.D.N.Y.2007).

Now before the Court is Xerox's motion for partial summary judgment on its first affirmative defense to Media Sciences's antitrust counterclaims as alleged in its Third Amended Answer, Affirmative Defenses, and Counterclaims. For the following reasons, Xerox's motion is GRANTED.

## I. BACKGROUND

Years before this lawsuit was filed, these same parties and their predecessors were involved in a series of lawsuits involving similar patent and antitrust issues. (Xerox Mem. Supp. Mot. S.J. at 2.) On May 4, 2001, the parties entered into a Settlement Agreement and Release (the "Settlement Agreement") terminating the litigation in the earlier cases. (*Id.*; *see UltraHue, Inc. v. Tektronix, Inc.,* No. 99–1664 (W.D.Wash. May 11, 2001); *Cadapult Graphic Sys., Inc. v. Tektronix, Inc.,* No. 00–732 (D.Or. May 14, 2001); and *Xerox Corp. v. Media Sciences, Inc.,* No. 01–0487 (W.D.Wash. July 20, 2001)). A final judgment was entered upon the Settlement Agreement in each case. (Ko Decl. Exh. A:1, 2, & 3.)

Five years later, on June 23, 2006, Xerox filed the complaint in this case, alleging that Media Sciences's manufacture, use, and sale of solid ink sticks for use in Xerox phase change color printers infringes several Xerox patents. *Xerox,* 511 F.Supp.2d at 378. On January 16, 2007, Media Sciences filed its Second Amended Answer in which it raised for the first time counterclaims alleging antitrust violations under § 2 of the Sherman Act. (Xerox Mem. Supp. Mot. S.J. at 3.) Xerox filed a motion to dismiss Media Sciences's antitrust counterclaims on January 30, 2007, (Docket No. 29), which the Court denied in part, as noted above, on September 14, 2007, *Xerox,* 511 F.Supp.2d 372. In its September 14 Order, the Court also granted Media Sciences's motion to file a Third Amended Answer that more fully pleaded its antitrust counterclaims, *id.* at 390, which Media Sciences filed on September 19, 2007 (Docket No. 44). On October 3, 2007, Xerox filed its Amended Reply and Affirmative Defense to Media Sciences's counterclaims. (Docket No. 48.) And, on June 20, 2008, Xerox filed the instant motion for partial summary judgment on its first affirmative defense to Media Sciences's antitrust counterclaims as well as a motion for summary judgment on the merits of Media Sciences's monopolization counterclaims. (Docket Nos. 99 & 101.) Only Xerox's motion for partial summary judgment on its first affirmative defense is addressed in this decision. (Docket No. 99.)

## A. Media Sciences's Antitrust Allegations Based on Xerox's Rebate Program and Xerox's Affirmative Defense Thereto

In its Third Amended Answer, Affirmative Defenses, and Counterclaims, Media Sciences alleges that Xerox is maintaining an illegal monopoly by engaging in "restrictive and exclusionary conduct, without any legitimate business justification" in violation of § 2 of the Sherman

Act, in part through its loyalty rebate program. (MS 3d Amend. Ans. at ¶ 47.) Specifically, Media Sciences contends:

Xerox has offered loyalty rebates to its resellers, distributors, and wholesalers who agree not to sell [Media Sciences's] replacement solid color ink sticks, which has the purpose and effect of reducing the supply of lower-price [sic] competing products in the relevant market. Because Xerox is the dominant supplier of replacement solid ink sticks with a large and widespread reseller network, these loyalty rebates are coercive and exclusionary. Unlike conventional volume discounts that manufacturers offer to resellers from which consumers benefit by lowering the price and increasing product supply, Xerox's loyalty rebates have the effect of excluding from much of the market the supply of [Media Sciences's] lower-priced replacement solid color ink sticks.

(*Id.* at ¶ 47(c).)

In its Amended Reply and Affirmative Defense, Xerox raises a provision of the Settlement Agreement as an affirmative defense to Media Sciences's antitrust counterclaims. Xerox alleges:

Under paragraph eighteen (18) of the Settlement Agreement and Release entered into on May 4, 2001 to conclude litigations between the parties and their predecessors in interest, Media Sciences covenanted that it would not assert or pursue a claim, or offer evidence, under any legal or factual theory that Xerox has engaged in or is engaging in any improper or illegal conduct by conditioning rebates, discounts, or marketing support or benefits on a reseller or distributor not selling solid ink manufactured or sold for Media Sciences, so long as Xerox has a good faith belief that Media Sciences, ink is continuing to cause failures or mechanical problems in Xerox solid printers. Because Xerox

has had and continues to have such a good faith belief, Media Sciences cannot bring an antitrust claim based on conditioning rebates, discounts, or marketing support.

(Xerox Amend. Reply at ¶ 57.)

### B. The Settlement Agreement

Essentially, Xerox alleges that the provision in ¶ 18 of the Settlement Agreement precludes Media Sciences from relying on its theory that Xerox is maintaining an unlawful monopoly through the loyalty rebate program, without first submitting to arbitration as provided in ¶ 25 of the mutually agreed upon Settlement Agreement. Paragraph 18 of the Settlement Agreement provides:

18. [Media Sciences] covenants that subsequent to this Agreement it will not assert or pursue a claim, or offer evidence, under any legal or factual theory that XEROX ... has engaged or is then engaging in any improper or illegal conduct by conditioning rebates, discounts, or marketing support or benefits on a reseller or distributor not selling solid ink manufactured or sold by or for [Media Sciences] so long as XEROX has a good faith belief that such ink is continuing to cause failures or material problems in XEROX solid ink printers. [Media Sciences] specifically releases any claims it may have against XEROX ... in any way arising out of or related to ... XEROX's Peak marketing programs as currently written.

(Ko Decl. Exh. A at ¶ 18.)

Reading the Settlement Agreement as a whole, *see United States v. Hamdi*, 432 F.3d 115, 125 (2d Cir.2005) (quoting 11 WILLISTON ON CONTRACTS § 32:11), the Court must also consider ¶ 25 of the Settlement Agreement. That paragraph defines the procedure and sets the standard by which Media Sciences may show that Xerox no longer has a good faith ·belief

that Media Sciences's ink sticks "cause failures or material problems in Xerox solid ink printers." (Ko Decl. Exh. A at ¶ 18.) Paragraph 25 provides in relevant part:

> 25. XEROX ... agree[s] that beginning one year from the anniversary of this Agreement, and not more frequently than once every nine months after the conclusion of any arbitration under this paragraph [Media Sciences] may demand arbitration over whether XEROX continues to have a good faith belief that solid ink sold or manufactured by [Media Sciences] causes problems or failures in XEROX solid ink printers. Arbitration of the issue described in subparagraph 25.1 below shall be [Media Sciences's] exclusive remedy for any claim that XEROX does not have a good faith belief that solid ink sold or manufactured by [Media Sciences] causes problems or failures in XEROX solid ink printers.
>
> 25.1 The only issue to be resolved in any such arbitration is whether during the six month period prior to the date of the arbitration demand, and taking into account the proportionate volume of ink sold, such ink has caused failures or material problems if XEROX solid ink [sic] at a materially higher proportionate rate than such problems or failures were caused, if at all, by use of XEROX solid ink in the applicable models of printers at issue. The factual determination of the arbitration shall be final and binding on the parties and the party demanding arbitration shall have the burden of proof.

(Ko Decl. Exh. A at ¶ 25, 25.1.) Whether ¶¶ 18 and 25 of the Settlement Agreement operate to preclude Media Sciences from pursuing its antitrust counterclaims based upon Xerox's rebate program at this time is the subject of the instant motion.

## II. DISCUSSION

### A. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the evidence "show[s] that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. 2505. A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986). The moving party bears the burden of proving that no genuine issue of material fact exists, or that because of the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223–24 (2d Cir.1994).

### B. Application of the Settlement Agreement

Xerox contends that to the extent that Media Sciences's antitrust counterclaims rely on allegations that Xerox's loyalty rebate program violates § 2 of the Sherman Act, those allegations are presently precluded because Media Sciences has not yet met the agreed upon condition to pursuing a claim or offering evidence based on Xerox's rebate program. (Xerox Mem. Supp. Mot. S.J. at 5–6; Ko Decl. Exh. A at ¶ 25.1.)[1] Paragraph 18 of the Settlement

---

1. Xerox also argues that Media Sciences's an-  titrust counterclaims are barred by the specif-

Agreement provides that such a claim may not be initiated provided that Xerox has a good faith belief that Media Sciences's ink sticks are causing failures or other significant problems in Xerox printers. (*See* Ko Decl. Exh. A at ¶ 18.) Paragraph 25 of the Settlement Agreement then explicitly provides for arbitration as the "exclusive remedy," (*Id.* at ¶ 25), to resolve any dispute as to Xerox's continued good faith belief. Paragraph 25 and the subparagraphs thereunder also set out an objective standard by which the arbitrator is to conclusively determine whether Xerox continues to have such a good faith belief [2] as well as the consequences of the arbitrator's factual findings. (*See id.* at ¶¶ 25.1–25.3.) Specifically, if Media Sciences prevails, Xerox must: (1) promptly cease distributing communications warning purchasers that Media Sciences's ink causes failures or material problems when used in the Xerox solid ink printers at issue, and (2) "rescind or terminate any condition to benefits or qualification in any marketing incentive program . . . ." (*Id.* at ¶ 25.2.)

Media Sciences contends that: (1) what it aptly characterizes as an arbitration clause, (*see* MS Opp. at 2), in ¶¶ 18 and 25

of the Settlement Agreement does not apply to its counterclaims because it only applies if Media Sciences challenges Xerox's good faith belief that Media Sciences's ink sticks continue to cause failures and material problems in Xerox printers, which Media Sciences has admittedly not done (*id.* at 7–8), or (2) to the extent that it applies, the Settlement Agreement is void as against public policy as a "release of prospective antitrust claims." (*Id.* at 2–7.)

### 1. Whether the language of the Settlement Agreement applies to Media Sciences's counterclaims

Media Sciences's contention that the arbitration provision of ¶ 25 is inapplicable to the counterclaims because Media Sciences has not specifically sought to litigate the issue of whether Xerox's actions have been taken in good faith ignores the basic tenant of contract law that a "contract must be construed as a whole and the intention of the parties is to be collected from the entire instrument and not from detached portions." *See Hamdi*, 432 F.3d at 125 (quoting 11 WILLISTON ON CONTRACTS § 32:11). The plain language of ¶ 18 of the Settlement Agreement conditions the pur-

---

2. As noted above, ¶ 25.1 provides:

ic release provision also contained in ¶ 18 of the Settlement Agreement, which provides: "[Media Sciences] specifically releases any claims it may have against XEROX . . . in any way arising out of or related to . . . XEROX'S Peak marketing program[ ] as currently written." (Xerox Mem. Supp. Mot. S.J. at 7; Ko Decl. Exh. A at ¶ 18.) However, in its Amended Reply and Affirmative Defense, Xerox alleges only that Media Sciences's cannot bring its antitrust counterclaims under ¶ 18 of the Settlement Agreement so long as Xerox continues to have a good faith belief that Media Sciences's ink causes failures and material problems in Xerox solid ink printers. (Xerox Amend. Reply at ¶ 57.) Because the Court decides Xerox's motion on the only ground alleged in its Amended Reply, the Court does not further address the specific release provision of ¶ 18.

The only issue to be resolved in any such arbitration is whether during the six months period prior to the date of the arbitration demand, and taking into account the proportionate volume of ink sold, such ink has caused failures or material problems in XEROX solid ink [printers] at a materially higher proportionate rate than such problems or failures were caused, if at all, by use of XEROX solid ink in the applicable models of printers at issue. The factual determination of the arbitration shall be final and binding on the parties and the party demanding the arbitration shall have the burden of proof.

(Ko Decl. Exh. A at ¶ 25.1.) Thus, contrary to Media Sciences's suggestion, the arbitration does not concern Xerox's subjective state of mind, but rather an objective determination of product performance.

suit of a claim or the offering of evidence that challenges Xerox's loyalty rebate program under any legal or factual theory on Xerox's continued "good faith belief that ... [Media Sciences's] ink is continuing to cause failures or material problems in XEROX solid ink printers." (Ko Decl. Exh. A at ¶ 18.) Paragraph 25 then provides arbitration as Media Sciences's exclusive means to challenge Xerox's continued good faith belief as referenced in ¶ 18 and sets out a procedure and a substantive standard by which the arbitrator must make her factual determination. (*Id.* at ¶ 25.)

Construing these provisions together to ascertain the intention of the parties, it is clear that the parties intended the arbitration of Xerox's good faith belief that Media Sciences's ink sticks continue to cause failures or material problems in Xerox solid ink printers to act as a precondition to asserting a claim or offering evidence challenging Xerox's loyalty rebate program. Read together, ¶¶ 18 and 25 create a conditional covenant-not-to-sue in ¶ 18 coupled with a mandatory arbitration clause in ¶ 25 and its subparagraphs.[3] The Court readily concludes that the provisions of the Settlement Agreement apply to Media Sciences counterclaims at issue.

### 2. Whether enforcement of the Settlement Agreement violates public policy

■ Alternatively, Media Sciences argues that even if ¶¶ 18 and 25 of the Settlement Agreement apply to its antitrust counterclaims the Court should refuse to enforce the Settlement Agreement because it is void as against public policy.

To begin, at this intersection of contract law and public policy, the Court is mindful that "when [a] court[ ] [is] asked to strike down on grounds of public policy a contractual arrangement on its face consensual ... [c]ases are not decided, nor the law appropriately understood apart from an informed and particularized insight into the factual circumstances of the" case. *Southwestern Sugar & Molasses Co. v. River Terminals Corp.*, 360 U.S. 411, 421, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959) (citation omitted); *see Madison Square Garden, L.P. v. NHL*, 2008 WL 4547518, at *7, 2008 U.S. Dist. LEXIS 80475, at *21 (S.D.N.Y. Oct. 10, 2008) ("*MSG v. NHL*") (quoting 17A C.J.S. *Contracts* § 218 (2008) ("There is no absolute rule by which to determine what contracts are against public policy, but each case must be determined from all the circumstances thereof, the courts declaring a contract void for such reason only where it is clearly contrary to the public interests ....")). In making such a determination in this case, the Court must consider competing public policy concerns.

First, Media Sciences is correct in asserting that the Supreme Court has suggested, albeit in dicta, that it would not hesitate to condemn a tandem of a forum-selection clause and a choice-of-law provision that operated "as a *prospective* waiver of a party's right to pursue statutory remedies for antitrust violations." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth,*

---

**3.** Citing *In re Currency Conversion Fee Antitrust Litig.*, 361 F.Supp.2d 237, 258 (S.D.N.Y. 2005), Media Sciences also argues in one paragraph that "if Xerox truly believed that an arbitration of its good faith belief was a precondition to any suit, Xerox was required to demand such an arbitration," and request a stay in the current litigation to do so. (MS Opp. at 9.) Because the plain language of the

Settlement Agreement does not permit Xerox to demand arbitration until nine months after Media Sciences prevailed in a previous arbitration initiated by Media Sciences as provided in ¶ 25, (*see* Ko Decl. Exh. A at ¶ 25, 25.3), which Media Sciences has admittedly not done, (*see* MS Opp. at 8), the Court rejects this argument.

*Inc.*, 473 U.S. 614, 637 n. 19, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (emphasis supplied). Following this suggestion, other courts have refused to enforce general releases and arbitration agreements that they have found act to waive or immunize parties from liability for future antitrust violations. *See, e.g., Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 324–328, 75 S.Ct. 865, 99 L.Ed. 1122 (1955) (holding that a prior settlement of an antitrust conspiracy case and the resulting judgment dismissing the suit with prejudice could not have res judicata effect in a later suit against additional parties in which the plaintiffs alleged claims based on new types of antitrust violations that were not contemplated by the earlier settlement when it would have the effect of conferring on defendants partial immunity from civil liability for distinct future antitrust violations); *In re Amer. Express. Merchs.' Litig.*, 554 F.3d 300, 319–20 (2d Cir.2009) (refusing to enforce a class action waiver in an arbitration agreement as against public policy "because to ... [enforce it] would grant [the defendant] de facto immunity from antitrust liability by removing plaintiffs' only reasonably feasible means of recovery," while affirming the arbitrability of antitrust claims more widely); *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 98–99 (5th Cir.1974) (holding that a general release of all claims did not operate, by its terms, to bar prospective antitrust claims, nor could it in view of public policy); *Fox Midwest Theatres, Inc. v. Means*, 221 F.2d 173, 179–80 (8th Cir.1955) (explaining that claims for new antitrust violations that arise subsequent to a general release of all claims needed no express protection in the release agreement because any "contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would be to that extent void as against public policy").

■ But, "[a]lthough there is an unquestioned public interest in the 'vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action,' this public interest does not prevent the injured party from releasing his claim and foregoing the burden of litigation." *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 891–92 (3rd Cir.1975) (quoting *Lawlor*, 349 U.S. at 329, 75 S.Ct. 865). And, courts have enforced even general releases to bar antitrust claims predicated on *continuing violations of pre-release* conduct, such as "conspiracies alleged to continue post-release." *VKK Corp. v. NFL*, 244 F.3d 114, 126 (2d Cir.2001); *see MSG v. NHL*, 2008 WL 4547518 at *7–8, 9–10, 2008 U.S. Dist. LEXIS 80475 at *23–25, *30–31.

■ Further, the Court is also cognizant of the competing policies favoring settlement and the enforcement of arbitration clauses. In general, public policy favors the settlement of disputes. *See MSG v. NHL*, 2008 WL 4547518 at *8, 2008 U.S. Dist. LEXIS 80475 at *24 (citing *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129–30 (2d Cir.2001)); *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 202 (2d Cir.2006). This fact has been specifically noted by a leading antitrust treatise: "Repose is especially valuable in antitrust, where tests of legality are often rather vague, where many business practices can be simultaneously efficient and beneficial to consumers but also challengeable as antitrust violations ...." II Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320a, at 282 (3d ed. 2007). Also, reading ¶¶ 18 and 25 together as a mandatory arbitration clause, *see Hamdi*, 432 F.3d at 125, the Court recognizes "a healthy regard for the federal policy favoring arbitration ...." *Mitsubishi Motors Corp.*, 473 U.S. at 626, 105 S.Ct. 3346

(internal quotation marks and citation omitted).

It is against this backdrop that the Court considers whether the Settlement Agreement is enforceable to preclude Media Sciences's antitrust challenge to Xerox's loyalty rebate program at this point in the litigation and concludes, for the following reasons, that its enforcement would not be "clearly contrary to the public interest." *MSG v. NHL*, 2008 WL 4547518 at *7, *9, 2008 U.S. Dist. LEXIS 80475 at *21, *30 (quoting 17A C.J.S. *Contracts* § 218).

Considering the facts and circumstances particular to this case, *see Southwestern Sugar & Molasses Co.*, 360 U.S. at 421, 79 S.Ct. 1210, and construing the language of the Settlement Agreement to ascertain "the intentions of the parties ... in light of the business purposes sought to be achieved," *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986), the Court observes that the provision in ¶ 18 of the Settlement Agreement is not a general release or waiver of antitrust liability or even a blanket covenant-not-to-sue. Rather, in substance, the provision is a conditional covenant-not-to-sue, conditioned on Media Sciences's ability to establish through the arbitral process a fact that would likely be relevant under § 2 of the Sherman Act, whether Xerox has a legitimate business justification for continuing to condition its rebates on re-sellers or distributors not selling Media Sciences's solid ink sticks. *See, e.g., Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 189–90 (2d Cir.1992) (granting summary judgment based on a defendant's uncontroverted assertion of quality control and maintaining a company's goodwill as legitimate business concerns).

It is also clear from the express language of the Settlement Agreement that the parties agreed that, at the time of the settlement, Media Sciences's replacement solid ink sticks had "caused failures or problems in XEROX solid ink printers." (Ko Decl. Exh. A at ¶ 14 & Exh. A:4.) As such, the parties agreed that Xerox could continue distributing notices to that effect to its customers "so long as XEROX continues to have a good faith belief that ... [Media Sciences's] ink is continuing to cause failures or material problems in XEROX solid ink printers," (*id.*), as to be determined under ¶ 25 (*see id.* at ¶ 25). Because of the failures and material problems that Media Sciences's ink had caused in Xerox printers, it is clear from the language of ¶ 18 that the parties also intended to permit Xerox to continue "conditioning rebates, discounts, or marketing support or benefits on a reseller or distributor not selling solid ink manufactured or sold by" Media Sciences as long as it continued to cause such acknowledged failures or material problems in Xerox printers, again as to be determined under ¶ 25 of the Settlement Agreement. (*Id.* at ¶¶ 18, 25.) It is the substance of the conditional covenant-not-to-sue in ¶ 18 read with the arbitration provisions of ¶ 25 that distinguishes this case from those in which courts have refused to enforce releases in the antitrust context for public policy reasons.

For example, in *Lawlor*, the Court refused to give a previous settlement agreement res judicata effect when it would have forever extinguished the plaintiffs' future antitrust claims alleging disparate types of anti-competitive conduct that was not contemplated by the parties' settlement in the earlier antitrust litigation. 349 U.S. at 324–28, 75 S.Ct. 865. Similarly, in *In re American Express Merchants' Litigation*, the court refused to enforce a class action waiver which, if enforced, would have conferred upon the defendants "de facto immunity from antitrust liability by removing plaintiffs' only reasonably feasible means of recovery." 554 F.3d at

319–20. And, in *Redel's Inc.*, the court refused to enforce a general release which would have forever waived any liability of the defendant for alleged post-release unlawful price discrimination claims. 498 F.2d at 98–99.

In contrast, the conditional covenant-not-to-sue in ¶ 18 of the Settlement Agreement does not waive or release any future liability of Xerox, not even liability arising out of its continuing to condition rebates on distributors not selling Media Sciences's ink sticks; nor does it provide Xerox with "de facto immunity" from suit, *In re Am. Express Merchs.' Litig.*, 554 F.3d at 320.

The Settlement Agreement merely conditions Media Sciences's asserting such claims based on Xerox's loyalty rebate program, or offering evidence in support thereof, on Media Sciences's first availing itself of the arbitration provisions in ¶ 25. Also, as previously stated, it is not lost on the Court that the mutually—agreed upon arbitration establishes a fact—whether Media Sciences's ink sticks continue to cause "failures or material problems" in Xerox printers—that would likely be of central importance in a future antitrust suit alleging that Xerox's loyalty rebate program constitutes anti-competitive conduct lacking any legitimate business justification. *See Trans Sport, Inc.*, 964 F.2d at 189–90. The requirement of submitting a material fact issue to arbitration hardly raises any policy considerations in light of the recognized use of arbitration to resolve antitrust claims. *Mitsubishi Motors Corp.*, 473 U.S. at 637, 105 S.Ct. 3346 (permitting an antitrust to proceed via arbitration in the international commercial context); *In re Am. Express Merchs.' Litig.*, 554 F.3d at 321 (permitting plaintiffs to pursue their class action antitrust claims in arbitration in the domestic commercial context); *Kristian v. Comcast Corp.*, 446 F.3d 25, 48 (1st Cir.2006) (en-

forcing a mandatory arbitration clause in the antitrust context in a domestic dispute).

Further, the competing policies favoring settlement, *see MSG v. NHL*, 2008 WL 4547518 at *8, 2008 U.S. Dist. LEXIS 80475 at *24 (citing *Bano*, 273 F.3d at 129–30); *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d at 202, especially in the antitrust context, II Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320a, at 282, and the enforcement of arbitration agreements, *Mitsubishi Motors Corp.*, 473 U.S. at 626, 105 S.Ct. 3346, also support the Court's analysis. Weighing the competing policy considerations in light of the specific facts presented in this motion, the Court finds no difficulty in concluding that conditioning suit on the successful arbitration of a relevant fact is not the type of "prospective waiver of a party's right to pursue statutory remedies for antitrust violations," that the Supreme Court contemplated in *Mitsubishi Motors Corp.*, 473 U.S. at 637 n. 19, 105 S.Ct. 3346. Therefore, the Court finds that the provision in ¶ 18 of the Settlement Agreement that conditions Media Sciences's pursuit of its currently pending antitrust counterclaims on arbitration under ¶ 25 is valid and enforceable.

## III. CONCLUSION

For the foregoing reasons, Xerox's Motion for Partial Summary Judgment on its First Affirmative Defense is GRANTED. While Xerox requested in its Amended Reply and Affirmative Defense that the Court dismiss with prejudice Media Sciences's antitrust counterclaims to the extent that they challenge Xerox's loyalty rebate program, considering the plain language of ¶¶ 18 and 25 of the Settlement Agreement and the policy favoring the availability of a judicial forum for antitrust

claims, the motion is GRANTED without prejudice.

SO ORDERED.